Public Utilities Commission
No. 84-136

APPEAL OF CHESHIRE BRIDGE CORPORATION
(New Hampshire Public Utilities Commission)

April 19, 1985

*Cleveland, Waters & Bass*, of Concord (*Robert T. Clark* on the brief and orally), for Cheshire Bridge Corporation.

*Gregory H. Smith,* attorney general (*Ronald F. Rodgers,* assistant attorney general, on the brief), by brief for the State.

SOUTER, J. This is an appeal under RSA 541:6 by the Cheshire Bridge Corporation from Order No. 16,852 of the public utilities commission, setting tolls to be charged by the company upon vehicles crossing its bridge over the Connecticut River, between Charlestown, New Hampshire and Springfield, Vermont. The company challenges the commission's disallowance of certain claimed expenses, its refusal to allow the company to compute tolls on passenger cars on a per axle basis, and its finding that the tolls as authorized would provide a just and reasonable rate of return. We affirm.

The company is a wholly owned subsidiary of the Springfield Terminal Railway, which is itself a wholly owned subsidiary of the Boston and Maine Railroad. The company operates the only privately owned toll bridge in the State, under a franchise derived from a ferry privilege originally granted in 1772. The company is a public utility as defined in RSA 362:2, whose rates must be approved by the commission under RSA 378:7.

After a 1981 rate proceeding, the commission ordered the company to do major reconstruction work on the bridge, which the company did at a cost of some $480,000. In 1983, the company filed a proposal under RSA 378:5 to increase its tolls for cars and motorcycles from 20¢ per vehicle to 20¢ per axle, and from 15¢ to 20¢ per axle for all other vehicles except railroad cars. The toll for railroad cars would have remained at $5 per car per round trip. By Order No. 16,288, the commission acted under RSA 378:6 to suspend the proposed schedule of tolls.

In January 1984, the commission issued Order No. 16,852, limiting the toll to 25¢ per car or motorcycle, but approving the other tolls as requested. After the commission's denial of a motion for rehearing, the company brought this appeal.

"We will not sustain such an appeal, except for errors of law, unless [the utility] demonstrates by a clear preponderance of the evidence that the [commission's] decision was unjust or unreasonable or reflects an abuse of commission discretion." *Appeal of Granite State Electric Co.,* 124 N.H. 144, 146, 467 A.2d 252, 253 (1983). It is against this standard that we must judge the company's position on each of the issues it has raised.

The first such issue is the soundness of the commission's refusal to recognize certain projected operating expenses when calculating the company's need for the revenue to be raised by charging tolls.

"In simplest terms, revenue is allowed to equal the total of approved operating expenses plus a reasonable return on

the value of certain property. The return is calculated by applying a rate of return to the cost less depreciation of the company's property that is 'used and useful in the public service.' "

*Appeal of Public Serv. Co. of N.H.*, 125 N.H. 46, 49, 480 A.2d 20, 22 (1984) (quoting RSA 378:27, :28).

The operating expense in question is a projected expense for maintenance of the bridge. The company projected an expense of $50,000 a year; the commission allowed $10,000.

In considering the reasonableness of the commission's action we start with the recognition that the company has no history of annual maintenance as a basis for its projection. Indeed, it was the chronic deferral of maintenance that led to the commission's 1981 order requiring repairs of nearly half a million dollars. Without such history, the amount of maintenance expense reasonably to be expected is more a matter for judgment, than for precise demonstration. *See New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 95, 302 A.2d 814, 817 (1973) (proper rate of return is a matter for the judgment of the commission based on evidence before it).

▮ Although such an act of judgment is not susceptible to precise review, the soundness of the commission's judgment is indicated by its reasons for rejecting some of the components of the company's expense projection. For example, the commission found that the projected expense of pointing up granite blocks in the bridge's piers should not be treated as annual expense at all, but should be capitalized and amortized over the life of the work. Some of the other claimed expenses, the commission found, were being doubly charged in the company's projections. For example, the expense of obtaining equipment for maintenance was also charged as part of the expense of renting equipment from the parent company. The commission therefore concluded that the company's projection of $50,000 a year included substantial double recovery. We think it is unnecessary to multiply examples. After discounting the company's projection, the commission judged that a projection of $10,000 for annual maintenance expense was sufficient. Nothing in the commission's process of reasoning suggests that it abused its discretion.

The company next challenges the commission's refusal to allow the company to double its tolls on passenger vehicles, by substituting a toll of 20¢ per axle for one of 20¢ per vehicle. This action by the commission has two aspects, which must be separately considered. First, the commission rejected a change in methodology for calculating tolls for passenger vehicles, from a per vehicle to a per axle system. Second, the commission rejected a 100% increase in such tolls.

The commission's rejection of the request to change the methodology simply followed from its rejection of a different request to approve the use, and the expense, of a certain "state of the art" toll collection device, which computed tolls on a per axle basis. The company had sought approval to use such a device as a means to limit toll evasion and employee theft. While the commission itself had ordered the company to take steps to eliminate evasion and theft losses, it nonetheless refused to approve the use of the state of the art devices, because the company had not compared such devices with less expensive ones on a cost-benefit basis. Thus the commission found the request for the most expensive devices unsupported and rejected their use until such time as the company might provide a cost-benefit analysis favorable to them.

■ It is fair to say, therefore, that the commission did not reject out of hand either the state of the art collection device, or its per axle toll collection formula. It simply rejected them unless and until the company could support them with favorable cost-benefit comparisons. There was nothing unreasonable in this decision.

Turning to the revenue aspect of the commission's refusal to approve the requested per axle tolls, the commission observed that allowing the requested 100% toll increase for passenger vehicles would result in charging cars "substantially more relative to weight than . . . trucks or railroad cars." The commission found this to be objectionable on the theory that a system of tolls based on weight was necessary if the tolls were to be proportional to the cost of providing service. The company asserts that this theory should have no place in setting the company's tolls, since "substantially all use [of the bridge] is within design limits."

■ We cannot accept the company's logic. The fact that most traffic over the bridge is "within design limits" does not imply that cost of service is unrelated to weight or that tolls should be unrelated to cost of service. In any event, the debate between the company and the commission on this issue raises some risk of obscuring the company's real claim, that the rates approved by the commission will not generate sufficient revenue to provide a "reasonable return" on the cost of the company's property devoted to the public service. *See* RSA 378:27, :28.

Under the rubric of "reasonable return" the company alleges three errors. The first is that the commission based the rates on a faulty projection of traffic volume and resulting revenue from tolls. Both the company and the commission based their projections on a survey of traffic from December 1 through December 7, 1982. On the average, 3,274 vehicles crossed the bridge each day. But because

there were no legal holidays during the test period, the company argues that the daily average is a misleading figure unless it be reduced by 2.5% to account for the eight to ten days, or 2.2% to 2.75% of the year, that are legal holidays.

■ The commission was not unreasonable in refusing to discount the average. The company's argument for a reduction of 2.5% apparently rests on the improbability that there would be no traffic over the bridge on legal holidays. The commission not only rejected this unlikely assumption, but noted that the test period probably did not occur during the period of heaviest use. To the extent that the commission could speculate at all about the soundness of the average figure, it could regard it as a conservative estimate, favorable to the company.

The company's second argument that the tolls will not produce an adequate rate of return rests on the claim that, in setting the schedule of tolls, the commission failed to make allowances for erosion or attrition in the rate of return. Such attrition occurs when income from rates or tolls fails to keep pace with increases in expenses or the value of additions to the company's rate base. *See generally New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 302 A.2d 814 (1973).

■ The burden is on the company to demonstrate that such attrition will occur. *See id.* at 97, 302 A.2d at 818; 1 A. PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION 204–06 (1969). In the present case the company attempts to prove that undue attrition will occur on the basis of a general projection for inflation of 6% a year.

■ For several reasons, however, the commission was certainly within the limits of allowable discretion in refusing to accept the company's argument. There was evidence indicating that inflation would not exceed 5% for the foreseeable period, while some of the expense items were fixed and therefore immune from inflation. Moreover, the commission was entitled to consider the reasonable possibility that "efficiency of management [and] operating economies" would weigh against such increases in expense as there might be. 1 A. PRIEST, *supra* at 205. As we will note in detail below, there was substantial indication in the record that the company offered opportunities for improved management. When we bear in mind that the company can require the commission to consider a rate increase after two years of actual experience with the present rates, it is clear that there was no abuse of discretion in refusing to allow even higher tolls in anticipation of attrition. *See* RSA 378:7. The company has not shown that the commission failed to exercise " 'a fair and enlightened judgment, having regard to all relevant facts.' "

*New Eng. Tel. & Tel. Co. v. State*, 104 N.H. 229, 234, 183 A.2d 237, 241 (1962) (quoting *Bluefield Co. v. Pub. Serv. Comm.*, 262 U.S. 679, 692 (1923)).

The company's remaining argument directly raises the ultimate issue that can be raised in an appeal from a utility rate order, whether the record indicates that the commission failed to allow a just and reasonable rate of return on the company's property that is used and useful in the public service. *See* RSA 378:27, :28. To understand the company's position, we must start with some fundamentals.

■ A utility's return is "the compensation which the investors in a utility business receive, over and above what must be deducted for expenses." F. WELCH, CASES AND TEXT ON PUBLIC UTILITY REGULATION 507 (rev. ed. 1968). At a minimum, the return must equal the cost of capital represented by the rate base, that is, by the depreciated value of the company's used and useful property. *New Eng. Tel. & Tel. Co. v. State, supra* at 232, 183 A.2d at 240.

A utility's cost of capital is the cost of borrowing money and the cost of attracting equity investment. In calculating the cost of capital, it is fair to say, generally, that:

> "[i]ndebtedness does not involve complexities. Costs are recorded to a nicety and will come directly from a utility's books.
>
> ... Equity or risk capital is, however, a different concept. It may or may not pay dividends; all profits after fixed charges accrue to it and losses come out of its hide.
>
> ... [F]ixing the 'cost' of equity requires (a) examination of recent issues (prices, terms and conditions acceptable to investors yesterday), (b) a hard look at the future to decide what must be offered investors tomorrow, (c) fairness to existing or 'captive' stockholders obviously concerned about the possible dilution of dividends and values per share and (d) maintenance of the utility's financial integrity generally."

1 A. PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION 208–10 (1969).

Once the cost of capital has been determined, it may be expressed as a percentage of the rate base. Since the capital is normally a combination of debt and equity for which the utility may pay different rates, the cost of capital as a percentage of the rate base will be a composite of two or more different rates. That is, the cost of capital is expressed as a weighted average of the cost of borrowing money

and the cost of attracting equity. *See id.* at 209. For example, a utility with 60% of its capital in the form of debt averaging a 10% interest rate, and the other 40% in equity in the form of common stock with an annual cost to the company of 15% of its value to the company, would have a cost of capital of 12% (i.e., .60 x 10% plus .40 x 15%).

As we noted above, once the cost of capital has been determined in the form of the weighted average, " 'it marks the minimum rate of return to which the company is lawfully entitled.' However, in accordance with the statutory directive that rates must be 'just and reasonable' (RSA 378:7, :27, :28), the Commission in the exercise of its judgment . . . can allow a rate of return in excess of the cost of capital." *New Eng. Tel. & Tel. Co. v. State,* 104 N.H. at 232, 183 A.2d at 240 (citations omitted).

The application of these fundamentals in the present instance was no simple matter, however, due to the peculiarities of the facts of the case. When the company applied for the toll increase, it addressed the cost of its capital by listing its debt, principally the debt incurred in the recent reconstruction of the bridge. The cost of the borrowed money was obvious, and the commission later allowed it.

The company did not, however, list an equity portion of capital or a cost attributable to it. The record nonetheless discloses two facts about the equity position. First, there are 1200 shares of outstanding common stock with a par value of $100 each. Second, the listing of liabilities on the company's balance sheet included a "Retained Earnings (deficit)" of minus $171,236. In its brief, the company referred to this condition as "a negative common equity position," which it admitted, but for which it has no explanation. The commission explained its equity position, however, by stating that "[t]he common equity consists of negative retained earnings due to the fact that dividends in the past were greater than earnings."

Faced with these facts, the commission allowed a return equal to the interest cost, plus what it called a "profit." Based on projected revenue, the commission estimated the profit at $26,526 before taxes, though it calculated that the profit could be as high as $52,226 if the company eliminated the losses from theft and evasion of tolls. The commission stated that "the profit or . . . [n]et income in the future should be used to reduce the negative common equity."

Given the anomalous negative equity position, the company does not argue that the overall rate of return falls below the cost of capital. But the company nonetheless argues that any profit that it may realize will be unreasonably low. It asserts that it must earn a "profit" of at least $50,000 if it is to attract new capital. Since it

asserts that it cannot earn such a profit from the approved tolls, it urges us to hold that the commission's order does not allow just or reasonable rates.

In dealing with the company's position, we must admit at the outset that it is not clear to us how the company derived some of the figures on which it bases its arguments. Certain points of contention are clear, however. We have already dealt with one of them, in rejecting the company's claim that the commission's traffic and revenue projections should be reduced by 2.5% to make allowances for legal holidays. A more significant point of contention is the company's argument that losses from employee theft and toll evasion will reduce any profit below the reasonable level of $50,000.

The commission, of course, noted that continued theft and evasion losses would reduce the profit from a potential of $52,226 to $26,526. The dispute between the commission and the company is therefore a dispute about who should bear responsibility for such losses.

The company's argument assumes that the public and not the company should bear the cost of theft and toll evasion, estimated by the company at 8% to 10% of tolls subject to collection. This assumption, however, is patently untenable. Unless we were to assume that such large losses are an irreducible necessity of the toll bridge business, the commission could not forgive such losses without condoning bad management.

 It should, however, go without saying that it is not the business of the commission to excuse bad management. This is the reason for the sound rule that "[t]he return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." *Bluefield Co. v. Pub. Serv. Comm.*, 262 U.S. at 693. That is to say, the right to a reasonable return on the rate base does not insulate a utility from responsibility for the consequences of inefficient or uneconomical management.

 This rule has an obvious application here. In 1981, the commission urged the company to take steps to reduce its losses from theft and toll evasion. We have already noted, however, that by the time of this rate hearing in 1982, the company had not studied the relative cost-effectiveness of the various toll collection machines that could reduce the opportunities for such losses. Under these circumstances, the commission was well within the bounds of reason when it refused to require the public to underwrite the cost either of

434 

"state of the art" collection equipment or of the continued losses of tolls.

Since the responsibility for losses rests with the company, the company cannot demonstrate that the commission's order prevents it from realizing the profit that it claims to need. Still less can it carry the burden to prove that the commission's order precludes it from raising the money necessary for the proper discharge of its public duties. On the record before us, it appears rather that whatever difficulties the company may have result from the past improvidence of those who voted to pay dividends in excess of earnings.

Since we find no error of law, and since the company has not carried its burden to demonstrate that the commission's order was unjust, unreasonable or an abuse of discretion, the order is affirmed.

*Affirmed.*

All concurred.