Public Utilities Commission
No. 86-454

APPEAL OF MANCHESTER GAS COMPANY

(New Hampshire Public Utilities Commission)

October 9, 1987

*Orr and Reno P.A.*, of Concord (*David W. Marshall* on the brief and orally), for Manchester Gas Company.

*Stephen E. Merrill*, attorney general (*Larry M. Smukler*, assistant attorney general, on the brief and orally), for the State.

BROCK, C.J. Manchester Gas Company (MGC or the company) appeals pursuant to RSA 378:31 and RSA 541:6 from two orders of the public utilities commission (PUC or the commission), in docket DR 85-214, regarding MGC's request for an increase in its basic rates. We affirm.

I. *Facts and Procedural History*

MGC is a New Hampshire public utility supplying natural gas to residential, commercial, and industrial consumers in Manchester and other towns close by. In order to request a change in its rates, the company filed revised tariff pages with the commission on August 16, 1985, pursuant to RSA 378:3; *see also* N.H. ADMIN. CODE Puc 1601.05. On September 9, the PUC suspended the revised schedules pursuant to RSA 378:6 for the purpose of conducting an investigation into the reasonableness of the proposed changes. *See* RSA 378:5.

The company also filed a petition for temporary rates. On November 27, following a hearing on November 25, the commission issued its report and order establishing the temporary rates. Thereafter, the PUC held seven days of hearings on the basic rate petition, after extensive investigation, auditing, and filing of testimony, exhibits and updates. The commission issued Report and Order No. 18,365 on August 11, 1986, rejecting the company's request and allowing it to collect increased annual revenues of only $378,602, nearly $1.2 million less than the company had requested.

On August 30, the company submitted a motion for rehearing and other relief raising many issues pursuant to RSA 541:3. The commission denied that motion by Report and Order No. 18,412 on September 24. The company thereupon appealed those orders to this court. In light of the special circumstances that no entity other than MGC was concerned in this appeal, we ordered that the State

become a party hereto. *See Melton v. Personnel Commission*, 119 N.H. 272, 277–78, 401 A.2d 1060, 1064 (1979).

## II. *Scope of Review*

Our scope of review in this case is limited by statute. RSA 541:13 provides

"[u]pon the hearing the burden of proof shall be upon the party seeking to set aside any order or decision of the commission to show that the same is clearly unreasonable or unlawful, and all findings of the commission upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable."

We have recently reiterated the narrow scope of appellate review of the commission's orders. In *Appeal of Conservation Law Foundation of New England*, 127 N.H. 606, 616, 507 A.2d 652, 659 (1986), a utility financing case, we stated that

"[w]hen . . . we are reviewing agency orders which seek to balance competing economic interests, or which anticipate such an administrative resolution, our 'responsibility is not to supplant the [c]ommission's balance of . . . interests with one more nearly to [our] liking. . . .' *Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968). The statutory presumption, and the corresponding obligation of judicial deference, are the more acute when we recognize that discretionary choices of policy necessarily affect such decisions, and that the legislature has entrusted such policy to 'the informed judgment of the [c]ommission, and not to the preferences of reviewing courts.' *Id.* at 767. Simply stated, as an appellate court we do not sit as a public utilities commission."

(Citation omitted.) In that case, however, we nonetheless acknowledged our "broad responsibility" to examine the evidence before the commission in order

"'to assure [ourselves] that the [c]ommission has given reasoned consideration to each of the pertinent factors' upon which the responsible derivation of policy and resolution of opposing interests must rest. *Permian Basin*

*Area Rate Cases, supra* at 792. That is our responsibility no less than it is our obligation to refrain from arrogating to ourselves the role of a public utilities commission."

*Id.* Keeping these standards in mind, we thus turn to the merits.

### III. *Issues Presented on Appeal*

The company raises five issues for us to consider. We will state briefly the substance thereof and then consider each issue in turn.

The first issue raised by MGC concerns attrition. The company contends that the PUC erroneously refused to adjust MGC's rate of return to reflect the effects of attrition on the company's rate base. Second, MGC argues that the commission erred in disallowing, or allowing only a portion of, the company's desired adjustments to certain test year data. More specifically, MGC alleges that the commission should not have disallowed certain increases in wages and insurance premiums simply because they occurred more than twelve months beyond the end of the test year. Third, MGC claims that the commission improperly denied a rate base adjustment that would reflect MGC's investment during the test year in purportedly non-revenue-producing utility plant. Fourth, the company challenges the commission's disallowance of some expenses relating to employee use of MGC vehicles. Fifth, and finally, MGC asserts that the commission erroneously denied approximately 11% of computer conversion and operating costs on the ground that that percentage represented costs allocable to non-utility-related operations.

### IV. *Attrition*

Attrition has been defined as

"'the term frequently used to describe the eroding effects which increased costs caused by inflation have upon the rate of return of a utility, which must apply fixed rates for its services. A regulated utility may encounter such increasing costs in securing additional capital (capital cost attrition), in adding new plant to service at incrementally higher per unit costs (rate base attrition), or in the operating expenses normally incurred to provide service (NOI attrition).'"

C. PHILLIPS, THE REGULATION OF PUBLIC UTILITIES 371 (1984) (quoting *Re Tampa Elec. Co.*, Order 9599 (Fla. 1980)); *see also Appeal of Cheshire Bridge Corp.*, 126 N.H. 425, 430, 493 A.2d 1151, 1155 (1985).

The company argues that it was error for the PUC to disallow any attrition adjustment in setting the allowed rate of return. The company initially requested a 1.080% attrition adjustment, which it updated to 0.903% and later further updated to 0.875%. MGC calculated this figure by measuring the total attrition between the time of its last rate case and the end of the test year, March 31, 1985, arguing in its post-hearing brief filed with the commission that such an historical approach to the calculation of attrition was legitimate and supported by past commission precedent. MGC has stated that the major source of attrition has been the greatly increased and continuing growth within MGC's service territory, requiring additional investment. Because the cost of new additions to plant is higher than the embedded costs upon which the revenues are based, the additional investment has generated revenue insufficient to produce the allowed rate of return on the additional construction. The rate base portion of the total attrition calculation is said to be 0.58%, and MGC claims that it is entitled, at a minimum, to a 0.701% attrition allowance.

Pared to the essentials, the commission's articulated reasons for disallowing the requested attrition allowance are as follows: (1) generally, MGC failed to satisfy its burden of proof to show that past attrition will continue to occur; (2) more specifically, the company did not do any prospective studies on the matter; (3) dramatic changes are occurring in the energy market such that past experience may not be a valid predictor of the future; (4) conversions along existing gas mains involve costs to the company below its average embedded costs, but MGC has done no studies to determine how frequently this would be the case; (5) the company has done insufficient strategic planning in the past; (6) inflation is currently lower than in the past; (7) MGC's status as a subsidiary of EnergyNorth, Inc. will result in certain efficiencies not heretofore obtained; (8) changes in the federal tax code may reduce MGC's tax expenses in the future; and (9) interest rates are declining, resulting in "negative attrition," or, more precisely, a lower cost of capital offsetting attrition caused by growth in the rate base. The PUC therefore rejected the company's requested 0.875% attrition adjustment.

The company argues that it demonstrated before the commission that it had experienced and was continuing to experience substantial attrition, especially rate base attrition, and that this attrition was likely to continue in the future. According to MGC, the commission could not lawfully reject this evidence by merely expressing amorphous doubts as to whether attrition would

continue to occur. Counsel for the State, in contrast, argues that the commission properly exercised its discretion based on the information in the record before it.

██ We note that no one disputes that MGC has the burden to demonstrate, first, that attrition will occur, *see Appeal of Cheshire Bridge Corp.*, 126 N.H. 425, 430, 493 A.2d 1151, 1155 (1985), and, second, that the commission abused its discretion in refusing an allowance therefor. *See* RSA 541:13. For the following reasons, we hold that the commission's disallowance of an attrition adjustment was not unreasonable.

In rejecting the company's requested attrition adjustment, the commission relied heavily on the fact that MGC did not produce any studies regarding future attrition, and stated that a company witness's "assumption that the experience of the 36 months prior to March of 1985 will be indicative of the next 36 months [was insufficient to meet MGC's] burden of proof in demonstrating that this will be the case." The PUC further noted that MGC had "not done any particular study or developed long range plans which support[ed] its position." In view of dramatic changes in the energy market, the lack of prospective studies was a particular problem for the PUC.

 A future attrition projection which is based solely on the existence of past or current attrition is insufficient to justify an attrition adjustment. *Re Attrition and Presentation of Rate Cases*, 66 PUR4th 478, 512 (D.C.P.S.C. 1985) ("Trend evidence tests are important in demonstrating the existence of attrition. However, once a utility demonstrates by trend evidence that it has experienced attrition, it must demonstrate that such attrition will likely continue into the future. . . . Past attrition . . . is thus relevant only if a utility can demonstrate that it is currently experiencing attrition and will likely continue to experience such attrition in the future."); *see also Re Western Massachusetts Electric Co.*, 37 PUR4th 219, 240 (Ma. D.P.U. 1980) (A "showing of past failures to earn an allowed return does not, by itself, support an attrition adjustment."); *Re Central Maine Power Co.*, 15 PUR4th 455, 479 (Me. P.U.C. 1976) ("Attrition by its very nature requires an estimate of the future. It is not susceptible to precise measurement as are historical facts. It is clear that judgment must play a role in making a decision. Concerning future attrition, however, the judgment must be circumscribed by facts and sound analysis and not based on unfettered opinions."). Thus, in the absence of forward-looking projections or studies regarding the existence and amount

of future attrition, the commission acted reasonably in rejecting the company's requested attrition allowance.

### V. *Denial of Adjustments to Test Year Data for Known and Measurable Changes*

MGC further argues that the PUC erroneously denied adjustments to test-year operating expenses for certain known and measurable changes. The commission limited the permissible changes to those occurring within twelve months following the end of the test year. MGC argues that this limitation constitutes error because it is an arbitrary departure from past commission precedent and elevates form over substance in creating a shibboleth of the so-called "matching principle," which may be defined as the notion that adjustments to test-year data should include both revenues and expenses incurred.

■ We reject the company's argument. Even assuming MGC is correct in its assertion that a twelve-month cutoff is a departure from prior commission policy, the commission need have only a reasoned basis for the departure. *See* 2 F. COOPER, STATE ADMINISTRATIVE LAW 532–33 (1965). In this instance, the PUC reasonably could create a twelve-month limitation for adjustments to test-year operating expenses. At some point, a cutoff is necessary to preserve the integrity of the matching principle. Because drawing a twelve-month line is neither more nor less arbitrary than any other form of line-drawing which agencies and judges undertake, we will not second-guess the commission's exercise of its informed expertise in this case.

### VI. *Disallowance from Rate Base of Certain Non-Revenue-Producing Plant*

The company further argues that the PUC's declination to include non-revenue-producing plant, such as production structures and certain gas-generating equipment, in rate base was erroneous. According to MGC, the commission has in the past allowed inclusion in rate base of non-revenue-producing plant, and in this instance, erroneously rejected the characterization of the assets at issue as non-revenue-producing. The State, in contrast, relies on staff testimony to the effect that the plant in question was not non-revenue-producing.

■ We conclude that the commission properly could accept the testimony of its staff and deny the requested adjustment. Staff witness Lanning testified that the so-called non-revenue-producing

additions to plant contributed to operating efficiencies and decreased maintenance costs, thereby contributing indirectly to revenue, and therefore were not properly characterized as non-revenue-producing.

Since the PUC was entitled to find that the structures and equipment were revenue-producing, it was also entitled to exclude them in the absence of a filing by the company that recognized the revenue-producing effect of those assets on the company's income for the test period in question.

## VII. *Company Vehicles*

In its decision, the commission excluded from the category of operating expenses costs associated with personal use of company vehicles by certain MGC employees. The commission stated that "[a]n expense must be necessary to providing service and provide a benefit (tangible or intangible) to the ratepayer to be included in the utility's cost of service for ratemaking purposes. After review, we find that the [c]ompany has not met its burden of establishing that [this cost is] necessary to providing service and benefit[s] the ratepayers. . . ."

MGC argues that its actual incurred expenses may not be disallowed absent a showing of waste or inefficiency. The company maintains that it presented uncontradicted evidence that the company vehicle expenses were reasonable, including evidence that much of the use of company vehicles was business-related and that personal use thereof was part of a compensation package characterizable as reasonable. Consequently, MGC contends, the commission was not at liberty to disallow the expenses. The State argues, to the contrary, that the PUC's disallowance was supported by the record and that the commission was not compelled to accept opinion testimony of company witnesses.

█ We hold that the commission acted reasonably in disallowing operating expenses representing employees' personal use of company vehicles. The PUC properly could view the allowance of such use by the company as wasteful and of no benefit to the utility's ratepayers. To the extent that this practice constituted waste, it also would be harmful to the ratepayers' interests. *See* C. PHILLIPS, *supra* at 238. The commission therefore did not err in rejecting the expenses associated with such use.

## VIII. *Computer Cost Allocation*

The commission further rejected the company's assertion that 100% of its computer use should be allocated to utility operations. Instead, the commission allocated only 89.27% of computer conversion costs and operating expenses to utility operations, relying on a 1983 Arthur Andersen report and the 89.27% allocation that MGC had proposed in its original filing. The commission disregarded the company's asserted change of position, which was reflected in MGC's claim that "because the [c]ompany's parent corporation, EnergyNorth, Inc. (ENI) intends to separate its nonutility operation into a separate affiliate at some point in the future," the computer in question would not be used for non-utility operations. The PUC noted that the regulatory approval process for such a spinoff of non-utility operations had not yet commenced, and therefore stated that "[g]iven the uncertainty surrounding this project, we find that it is not at this point a known and measurable change."

■ The company observes that the company's amended allocation proposal was not contradicted by evidence in the record, and therefore argues that the commission erred in accepting the company's original allocation proposal. The State, however, argues that the PUC acted reasonably in allocating computer costs to non-utility operations because, *inter alia*, the company had not yet begun to implement its objective of spinning off MGC's non-utility operations into a separate affiliate. We agree with the State that the commission's decision was not erroneous. The PUC reasonably could reject the projected but unimplemented allocation and, moreover, properly stated that it would reconsider its position when and if the company chooses to separate the utility and non-utility operations formally.

## IX. *Conclusion*

■ A matter that we have not overlooked throughout our discussion above is the allocation of burdens of proof in administrative proceedings. While it is true that the utility bears the burden of proof in administrative proceedings in which it is the moving party, the agency must have an articulated and reasoned basis for denying or rejecting utility requests. Because we hold that the commission had such reasoned bases for its various decisions, we affirm.

*Affirmed.*

BATCHELDER, J., did not sit; the others concurred.