Public Utilities Commission
No. 87-311

## PETITION OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
### (New Hampshire Public Utilities Commission)

January 26, 1988

*Sulloway, Hollis & Soden,* of Concord (*Martin L. Gross* and *R. Carl Anderson* on the brief, and *Mr. Gross* orally), for Public Service Company of New Hampshire.

*Stephen E. Merrill,* attorney general (*Mr. Merrill* and *Larry M. Smukler,* assistant attorney general, on the brief, and *Mr. Smukler* orally), for the State.

*Michael W. Holmes* and *Joseph W. Rogers,* of Concord (*Mr. Holmes* and *Mr. Rogers* on the brief, and *Mr. Holmes* orally), for the Office of the Consumer Advocate.

*Hinkley & Hahn,* of Manchester (*Robert C. Hinkley & a.* on the brief, and *Mr. Hinkley* orally), for the Campaign for Ratepayers' Rights.

*Michael B. King,* of Portsmouth, by brief for Mary P. Chambers, House Minority Leader, as *amicus curiae.*

BATCHELDER, J. This interlocutory transfer, filed by the New Hampshire Public Utilities Commission (PUC or commission) pursuant to RSA 365:20, raises the issue of the constitutionality of applying RSA 378:30-a to the fixing of electric utility rates in an emergency rate proceeding. The commission reserved, certified, and transferred three questions of law which are set forth in the discussion below. We answer all three questions in the negative, and hold that RSA 378:30-a is constitutional under the State and Federal Constitutions on the facts presented to us in this transfer.

I. *Facts and Procedural History*

This interlocutory transfer is viewed, and its issues decided, against a factual background which must be unique in the annals of public utility financing. Public Service Company of New

Hampshire (PSNH or company) is the owner of an approximately 35% interest in the Seabrook Unit I nuclear generating station, which for practical purposes had its construction phase completed on or about October 31, 1986, at a cost to PSNH of $1,770,617,913. The total project cost, we were told at argument, has, since the completion date, been increasing at the rate of $50 million per month. Because its final licensing proceeding is yet to be complete, the plant is producing neither electricity nor income, and the likelihood and timing of either event are matters of speculation and uncertainty.

To ameliorate the costly effects of these circumstances, PSNH, on August 5, 1987, petitioned the commission to "Alter Existing Rates on Account of Emergency Circumstances," docketed as DR 87-151 (application). PSNH requested an emergency rate surcharge which would produce approximately $70.98 million in additional annual revenues, an increase of 15% based on sales for the twelve months ended December 31, 1986. In its application, PSNH proposed that the commission allow the company a special emergency rate base increment of $464.5 million, representing approximately 27% of PSNH's total investment of $1.77 billion in Unit I. PSNH proposed also that the commission allow a special emergency rate of return of 15.28%, the company's cost of debt capital as determined by the commission in PSNH's most recent rate case, DR 86-122. *See* Report and Order No. 18,726 (June 1987). In order to expedite consideration and determination of this application, PSNH submitted, on the same date, a request that the commission reserve, certify, and transfer the following question to this court in accordance with RSA 365:20:

"Where a public utility alleges that at its currently allowed rates as restricted by RSA 378:30-a,

(1) Its cash provided from internal sources is insufficient to meet all requirements of the conduct of its business;

(2) Its access to cash from external sources through sale of its securities is so restricted as to be unavailable upon reasonable terms, and

(3) Accordingly, its earnings are insufficient to enable it to attract capital or to maintain its credit, or otherwise to support its financial integrity,

Is the public utility entitled to a hearing to establish a level of rates to restore its financial integrity consistent with the interests of customers, notwithstanding RSA 378:30-a, the so-called 'anti-CWIP' statute?"

The commission anticipated that answers to the question set forth in the requested transfer were likely to control the outcome of PSNH's request for emergency relief in DR 87-151 and granted PSNH's request without holding a hearing. Furthermore, without making specific findings of fact, the PUC provided this court with basic facts that the commission accepted for purposes of this transfer. The commission also added a second question which addressed the constitutionality of applying RSA 378:30-a:

"Does the U.S. Constitution or the N.H. Constitution require or allow the Commission to, when setting rates, include construction work in progress [(CWIP)] on a construction project in rate base before said construction project is actually providing service to customers, notwithstanding the requirements of RSA 378:30-a?"

Following the filing of the interlocutory transfer, a prehearing evaluation conference was held before Howard J. Zibel, Esquire, Deputy Clerk of this court, for the Supreme Court on August 25, 1987, the primary focus of which was consideration of the adequacy of the factual record. As a result of that conference, we deferred acceptance of the transfer in an order dated September 2, 1987, until the commission conducted hearings and made findings of fact sufficient for "informed consideration of [the] constitutional issues." *Appeal of Public Serv. Co. of N.H.*, 125 N.H. 46, 48, 480 A.2d 20, 21 (1984). Specifically, this court requested the commission to make findings of fact on the following issues:

"a. The claimed need to include some of the company's investment in the Seabrook I reactor in the company's rate base in order to obtain the cash required by the end of 1987 to make interest payments as they come due, to pay off existing debt as it matures and to pay for the expansion of services to customers.

b. The date upon which the commission first authorized inclusion of such investment in the rate base, and the amounts of the company's investment prior to that date, between that date and the effective date of § 30-a, and thereafter."

The commission held hearings on the proposed issues on September 16, 17, and 21, and on October 16, 1987, submitted to this court a record reflecting findings of fact on both issues. *See* Report and Sixth Supplemental Order No. 18,873. A supplemental report and record was transferred to this court on November 2. Report and Ninth Supplemental Order No. 18,890.

Under issue a., the PUC found with respect to the "claimed need" of PSNH that it was unlikely that PSNH would be in a position to meet its cash obligations as they became due: namely, interest and principal payments on debts, expansion of service to customers, and fuel expenses, payroll, and other related expenses. The commission examined two traditional sources of funds for PSNH: external financing and rates. The PUC found that financial markets are unwilling to provide additional new funds for PSNH due to investor perceptions of high risk. The commission noted, however, that there is the possibility that existing debt could be restructured, but it is improbable that this would occur before January, 1988. External financing, therefore, is not a dependable alternative for restoring PSNH's financial integrity.

The other source of funds for PSNH is rates. Before considering the variables involved in an actual rate increase, the commission examined two rate-related alternatives. The commission found that PSNH could delay a refund owed to ratepayers ordered by the PUC in a previous docket. This would provide approximately $21 million, and would permit PSNH to meet its cash obligations into 1988. However, PSNH did not request authorization to delay the refunds, and the commission did not intend to authorize such a delay *sua sponte.*

The second alternative dealt with the possibility of PSNH's successfully appealing the prior rate order in DR 86-122. However, the PUC determined that even if PSNH were successful, the maximum amount PSNH could add to its revenues would not meet its claimed revenue needs.

The most realistic alternative, according to the commission, is additional cash through a rate increase. In order to justify this, one or more of three variables in the formula expressing the traditional ratemaking methodology might be adjusted to allow higher revenue to be raised by rates charged to consumers. *See Appeal of Conservation Law Foundation,* 127 N.H. 606, 640, 507 A.2d 652, 675 (1986); *Appeal of Public Serv. Co. of N.H.,* 125 N.H. at 49, 480 A.2d at 22. The first is the value of the rate base, which could be increased by including a portion of PSNH's investment in Seabrook. The commission found this approach specifically

precluded by RSA 378:30-a. *See Appeal of Public Serv. Co. of N.H.,* *supra* at 54–55, 480 A.2d at 25.

The second variable is the expense component of the ratemaking formula, which could be adjusted upward to cover the cost of servicing debt or equity capitalization not reflected in the rate base. However, the commission concluded that this would result in covering capitalization related to PSNH's investment in Seabrook. Again, the commission believed that this was prohibited by § 30-a.

The third variable subject to adjustment is the rate of return on rate base. According to the testimony, the commission found that modifying this variable to meet actual revenue need would require a return on equity of 52.08% (34% after tax adjustments) to achieve the requested revenue level. But such rates would far exceed traditional rates of return, and the commission was concerned that authorizing them would merely circumvent the restrictions of § 30-a. *See Appeal of Public Serv. Co. of N.H., supra* at 55, 480 A.2d at 26 (commission may not adjust rate of return to permit recovery of lost investment, as distinguished from reflecting risk of such loss in setting rates).

The PUC found, in conclusion, that PSNH needs additional revenues from a rate increase in order to meet its cash obligations. However, a sufficient adjustment of any one of the variables comprised by the traditional ratemaking formula would, in the opinion of the commission, violate § 30-a.

Under issue b., concerning the historical levels of investment by PSNH in Seabrook at various times related to the effective date of § 30-a, the commission constructed a table reflecting such levels of investment, which was supplemented later by a revised table. Although PSNH's ownership percentage in Seabrook Unit I has decreased from 50% to 35.56942% since the enactment of RSA 378:30-a, the commission noted that PSNH's cash investment did not decline and did not, therefore, adjust the investment to reflect the change. The commission included as PSNH's cash investment the cost of procuring and constructing Seabrook Unit I, indirect costs, common plant, nuclear fuel, and land. The common plant component of the investment consists of the facilities designed to serve both Unit I and Unit II. The first table displayed the total investment in Unit I without deducting any portion of the common plant, since the PUC at that time lacked the appropriate figures. The second table, provided in the supplemental report and record, showed PSNH's investment in Unit I, including only 50% of the common plant. While the PUC found it most reasonable for purposes of this case to split the common plant evenly between the

two units, it noted that it made no finding regarding the proper method of allocating plant for purposes of rate base once one plant of a two-plant project is cancelled and the other is operating. The following table, which embodies the final results provided in the supplemental report and record, sets forth the commission's findings on PSNH's investment in Unit I:

| Date | PSNH Investment in Unit I |
|---|---|
| 04/30/77 | 65,003,098 |
| 05/31/78 | 152,376,338 |
| 04/30/79 | 214,210,548 |
| 12/31/79 | 287,920,316 |
| 12/31/80 | 408,505,079 |
| 12/31/81 | 445,555,835 |
| 12/31/82 | 607,373,109 |
| 12/31/83 | 854,348,392 |
| 12/31/84 | 1,084,696,629 |
| 12/31/85 | 1,347,895,265 |
| 12/31/86 | 1,624,262,219 |
| 12/31/87 | 1,766,468,881 |

Commissioner Bisson concurred in the commission's report, but submitted separate tables on the investment levels which excluded PSNH's investments in the plant's education center and the termination yard, which is the main switching yard for the station, because those items have been included in the company's rate base for several years.

On November 4, 1987, after the filing of the commission's supplemental report, we accepted the interlocutory transfer and ordered briefing. On November 5, 1987, the PUC filed a request to address the following third question, which we accepted:

> "Does the proper interpretation of RSA 378:9, which provides that the commission may 'temporarily . . . alter, amend or suspend any existing rate, fare, charge, price, classification or rule or regulation relating thereto . . .' when it finds that an emergency exists, allow the commission, upon the finding that an emergency exists, to depart from traditional ratemaking methods to establish temporarily rates which will allow a utility to meet cash flow requirements, notwithstanding the provisions of RSA 378:30-a?"

Oral arguments were held on December 15, 1987, during which the parties addressed the transferred questions, summarized as follows: (1) the right of PSNH to obtain a hearing before the PUC

to establish a level of rates necessary to restore PSNH's financial integrity, notwithstanding the "anti-CWIP" statute, RSA 378:30-a; (2) the constitutionality of RSA 378:30-a under the circumstances of this case; and (3) the authority of the PUC to set emergency rates pursuant to RSA 378:9 under the circumstances of this case, notwithstanding RSA 378:30-a.

## II. *Constitutionality of the Statute*

It should be noted at the outset that PSNH does not make a facial attack on the anti-CWIP statute and claim its unconstitutionality *per se*, but bases its claim on the particular facts giving rise to the transferred questions in this case. In other words, PSNH claims unconstitutionality as the statute is applied to it in the company's present circumstances. Hence, the focus of our inquiry can be considerably narrowed by recognizing the obvious relationship between transferred questions 1 and 2. Although initially PSNH sought only the right to a hearing before the PUC, the commission concluded that the company would not be entitled to the revenue increase in the amount requested unless RSA 378:30-a was held invalid. (The commission, of course, did not make any finding at this stage of the proceeding as to whether the standard of "just and reasonable" would permit any increase in rates at this time.) Indeed, PSNH recognized this in framing question 1, as it sought a hearing and rate increase "notwithstanding RSA 378:30-a." It is clear then that question 1 is subsumed by question 2, and both stand or fall together.

The text of the statute under examination provides:

> "378:30-a *Public Utility Rate Base; Exclusions.* Public utility rates or charges shall not in any manner be based on the cost of construction work in progress. At no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed. All costs of construction work in progress, including, but not limited to, any costs associated with constructing, owning, maintaining or financing construction work in progress, shall not be included in a utility's rate base nor be allowed as an expense for rate making purposes until, and not before, said construction project is actually providing service to consumers."

RSA 378:30-a. Both the concept of CWIP and the interpretation of the broad prohibitory language of this section have been fully examined by this court in *Appeal of Public Serv. Co. of N.H. supra,*

and need not be repeated here. Suffice it to say that the anti-CWIP law simply forbids return on or recovery of investments through utility rates before the project is completed and providing service to customers. *Appeal of Public Serv. Co. of N.H., supra* at 54–55, 480 A.2d at 25. One response to this mandate is known as an allowance for funds used during construction (AFUDC), which reflects the cost of delay in earning a return when an investment ultimately is placed in the rate base. *See Appeal of Public Serv. Co. of N.H.*, 125 N.H. at 50, 480 A.2d at 22.

We do not, however, rely on AFUDC in assessing the constitutionality of RSA 378:30-a under the fifth and fourteenth amendments to the United States Constitution and part I, article 12 of the New Hampshire Constitution. We look instead to the constitutional limitations on rate regulation set forth by the United States Supreme Court in *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944). *Hope* represents the culmination of decades of judicial inquiry into the proper constitutional restraints on the process of public utility rate regulation and the focus of substantive judicial review of ratemaking. *See generally* Drobak, *From Turnpike to Nuclear Power: The Constitutional Limits on Utility Rate Regulation*, 65 B.U.L. REV. 65 (1985). The opinion in *Hope* establishes a limited and simplified constitutional yardstick. Briefly, the constitution requires only that the regulatory body engage in a rational process of balancing consumer and investor interests to produce a rate that is just and reasonable. 320 U.S. at 602, 603. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 791–92 (1968) (commission to give reasoned consideration to investor interests as well as provide protection to the relevant public interests); *Market Street R. Co. v. Comm'n*, 324 U.S. 548, 563 (1945) (investor interests considered in light of diminished service to the public); *Appeal of Conservation Law Foundation*, 127 N.H. at 636, 507 A.2d at 672 (object of process is to strike a fair balance between customer and investor interests); *Pennsylvania Elec. v. Pennsylvania Pub. Util.*, 502 A.2d 130, 133 (Pa. 1985) (*Hope* requires only that regulatory agency balance competing consumer and investor interests to determine just and reasonable rates). A just and reasonable rate is one that, after consideration of the relevant competing interests, falls within the zone of reasonableness between confiscation of utility property or investment interests and ratepayer exploitation. *See, e.g., Appeal of Conservation Law Foundation, supra* at 635, 507 A.2d at 672; *LUCC v. Public Serv. Co. of N.H.*, 119 N.H. 332, 342, 402 A.2d 626, 632 (1979); *Washington Gas Light Co. v. Baker*, 188 F.2d 11, 15 (D.C. Cir. 1950),

*cert. denied*, 340 U.S. 952 (1951). With regard to investment interests, a just and reasonable rate is one which reflects, among other things, a rate of return "commensurate with returns on investments in other enterprises having corresponding risks." *Power Comm'n v. Hope Gas Co., supra* at 603; *Company v. State*, 95 N.H. 353, 361, 64 A.2d 9, 16 (1949).

■■ *Hope*, however, is apposite to the question before us, not for what it holds that the constitution promises, but rather for what it explains that the constitution declines to guarantee. The import of *Hope* is that the constitution is only concerned with the end result of a rate order; *i.e.*, that it be just and reasonable. Under *Hope*, the particular ratemaking methodology employed by the regulatory agency is, for the most part, constitutionally irrelevant. *See Power Comm'n v. Hope Gas Co.*, 320 U.S. at 602 (commission not bound to any single ratemaking formula). The only limitation on the methodology is that it produce neither confiscatory nor exploitative rates.

■■ The anti-CWIP statute affects ratemaking methodology by assigning the cost of carrying investment in CWIP, and by allocating the risk of direct loss that may result if the construction never becomes productive, to investors rather than consumers. *See Appeal of Public Serv. Co. of N.H.*, 125 N.H. at 50, 480 A.2d at 22. As noted above, it forbids the commission from setting utility rates to be paid by consumers on the basis of investment in construction prior to commencement of a project's operation. *Id.* at 54–55, 480 A.2d at 25. Thus, the construction risks of such projects are not to be passed on to ratepayers. Instead, these risks are, by legislative mandate, to be borne by investors. The constitutional consequence of this type of risk allocation is that those who bear the risk must be compensated by a return on their investment that reflects the risk that the statute places upon them.

The PUC has already addressed the effect of this risk allocation. In *Re Public Serv. Co. of N.H.*, 64 N.H.P.U.C. 295, 304 (1979), the PUC acknowledged that in making rates, its discretion is expressly limited by the language of the anti-CWIP statute. Additionally, the commission correctly maintained that it has a "duty to balance the interests of the investor and the consumer through the establishment of just and reasonable rates, the 'touchstone' for utility regulation." *Id.* The commission concluded that exclusion of CWIP from PSNH's rate base had the effect of substantially increasing investor risk. *Id.* at 306. The PUC determined that the overall rate of return on PSNH's rate base, even though that rate base no longer

includes CWIP, may have to be enhanced to reflect the additional risk to investors created by anti-CWIP. *Id.* Indeed, the PUC granted such an enhanced rate of return in *Re Public Serv. Co. of N.H.*, 65 N.H.P.U.C. 45, 48–51 (1980), and since that time the company has filed one appeal challenging the rates or rate of return allowed by the commission, an appeal which is currently awaiting argument before this court.

The company concedes that the anti-CWIP law can be constitutionally applied in some circumstances. Furthermore, the company does not claim that no rate could ever be commensurate with the risk imposed by § 30-a. Moreover, as revealed by the PUC's treatment of § 30-a in its 1979 and 1980 orders discussed above, there is no basis for claiming that the timing of the enactment of § 30-a precludes constitutional application. Throughout the life of the Seabrook project, with the exception of the limited period between PUC Order No. 13,162 (May 25, 1978), which included CWIP in the company's rate base, *see LUCC v. Public Serv. Co. of N.H.*, 119 N.H. 332, 402 A.2d 626 (upholding order as a matter of policy), and the effective date of § 30-a (May 7, 1979), CWIP has been excluded from the rate base. This is not a situation, for example, in which the anti-CWIP law was enacted on the eve of the loss itself, so that enforcing it would preclude both a return commensurate with risk and a recoupment of the loss.

The essence of the company's position in this interlocutory transfer is not, therefore, the company's desire for the setting of a just and reasonable rate to compensate investors for the risks they have assumed. PSNH seeks, rather, nothing less than allocation of the risk back to the ratepayers now that the risk of inoperative investment has materialized. Section 30-a injected into the investment assessment the risk of delay of return, not only during construction, but also when construction is completed, possibly forever. That is, failure to recover the cost of a completed but non-functioning plant is one of the risks that a higher rate of return compensates the investors for bearing. That risk has materialized; and now, by asking that CWIP be included in rate base, the company is asking to shift the risk back to the ratepayer. The company and its investors have received compensation for the risks they have assumed through an enhanced rate of return, and here seek relief from those risks now that they have come to pass. Essentially, the company seeks a bailout. With or without anti-CWIP, the State and Federal Constitutions do not allow the company to have it both ways. In the words of the Pennsylvania Supreme Court:

"In cases where the balancing of consumer interests against the interests of investors causes rates . . . which [are] insufficient to ensure the continued financial integrity of the utility, it may simply be said that the utility has encountered one of the risks that imperil any business enterprise, namely the risk of financial failure."

*Pennsylvania Elec. v. Pennsylvania Pub. Util.*, 502 A.2d at 134.

Although *Hope* does guarantee a return proportionate to the risk, PSNH is wrong in contending that *Hope* and its progeny guarantee to a utility a rate which assures its financial integrity. Based on the clear indications that the Hope Natural Gas Company was financially sound and well-managed, the *Hope* court enumerated as a consideration for the regulatory agency the impact that a particular rate would have on the financial integrity of the company. *Power Comm'n v. Hope Gas Co.*, 320 U.S. at 603. But *Hope* made no promises with respect to guaranteeing net revenues, *id.*, and later cases reiterated *Hope*'s statement that regulation does not insure profits. *See, e.g., Market Street R. Co. v. Comm'n*, 324 U.S. at 566. The Supreme Court has expressly held that it is not the mandate of the constitution to rejuvenate the value of the investments of a company whose "zenith of opportunity" has been eclipsed by the operation of economic forces. *Id.* at 554; *cf. Appeal of Conservation Law Foundation*, 127 N.H. at 636, 507 A.2d at 672. Providing a return sufficient to maintain the financial integrity of a sound company is one thing; restoring the financial integrity is another.

At this juncture, we point out that a case much relied upon in the brief of PSNH, *Jersey Central Power & Light Co. v. Federal Energy Regulatory Comm'n*, 810 F.2d 1168 (D.C. Cir. 1987) (*Jersey Central*), is not as helpful to the company's position as might appear on a first reading. In *Jersey Central*, the utility sought relief from a Federal Energy Regulatory Commission (FERC) order modifying the utility's proposed rate schedule. The utility charged "that it alleged facts which, if proven, show that the reduced rates are confiscatory and violate its statutory and constitutional rights as defined by the Supreme Court in [*Hope*]." 810 F.2d at 1169. Several factors distinguish *Jersey Central* from this interlocutory transfer. First, the utility in *Jersey Central* was denied a hearing, resulting in its rate schedule being reduced summarily. Second, although the utility claimed entitlement to relief under *Hope* because of its financial precariousness resulting from its lost $397 million investment in a cancelled nuclear generating station at Forked

River, New Jersey, there was no legislatively established policy, to be considered in any *Hope* analysis, relating to exclusion from rate base of CWIP. Finally, in *Jersey Central*, FERC denied a hearing to the utility despite the utility's claim that the commission would neither include the lost construction investment in the rate base, nor allow the utility a rate of return consistent with placing the risk of loss entirely on the utility and its investors. *Id.* at 1171. Thus, where FERC was alleged to have denied both rate base treatment and an adequate return, PSNH here demands to be given both.

*Jersey Central*'s teachings are simple. First, the utility was impermissibly denied a hearing to make its case and to distinguish its situation from other instances in which FERC had excluded unamortized investments in cancelled plants from rate base, upon which FERC based its precedential foundation for summarily disposing of Jersey Central's request. *See* 810 F.2d at 1172. The second teaching of *Jersey Central* is that "the end result of commission rate orders must be 'just and reasonable' to both consumers and investors, and that, in achieving this balance, the commission must consider the impact of its rate orders on the financial integrity of the utility." *Id. Jersey Central* does not stand for the proposition, nor does PSNH argue, that a publicly regulated utility has a constitutional right not to go bankrupt. The case does not deal in any way with the public policy of anti-CWIP legislation. *Jersey Central* is not dispositive of this case.

At a time when Jersey Central Power & Light, and other utility companies in States where no anti-CWIP statutes were in force, determined that market forces required them to abandon future construction of nuclear generating plants already under construction, PSNH in the face of an unchallenged anti-CWIP statute determined to proceed with construction. The risk of doing so was measured and calculated closely by the marketplace and investors, and was reflected in the interest rates charged on the company's bonds and notes and the market prices of its equity shares. The risk of failure was present in this enterprise as with any other business venture and was available for assessment by those who lent money and those who bought shares.

In enacting the anti-CWIP law, the legislature recognized that the rule may cause utilities to experience cash flow or other financial difficulties. *See* N.H.S. JOUR. 604–15 (1979). It was fully cognizant that the CWIP prohibition would have the effect of allocating the direct consequences of the risk of non-operation to investors, rather than ratepayers. REPORT OF THE SCIENCE AND TECHNOLOGY COMMITTEE, N.H.H.R. JOUR. 626–27 (1977). The

legislature was aware that this risk allocation is ultimately more expensive for consumers if the project succeeds. *See generally Appeal of Public Serv. Co. of N.H.*, 125 N.H. at 50, 480 A.2d at 22 (describing allowance for funds used during construction (AFUDC) method of cost recovery). The anti-CWIP law, however, protects consumers against the direct consequences of a failed investment and places the onus on the financial markets to assess carefully investment decisions. REPORT OF THE SCIENCE AND TECHNOLOGY COMMITTEE *supra.*

In making this determination, the legislature effectuated a return to the traditional interpretation of the used and useful principle. *See LUCC v. Public Serv. Co. of N.H.,* 119 N.H. at 343–44, 402 A.2d at 634 (permitting commission discretion in applying used and useful so as to include CWIP in rate base). This principle has been a long-standing tenet of New Hampshire public utilities law in determining whether a utility's property is included in or exluded from its rate base for ratemaking puposes. *Appeal of Conservation Law Foundation*, 127 N.H. at 637, 507 A.2d at 673. Indeed, the principle enjoyed constitutional status until the *Hope* decision. *Compare Smyth v. Ames*, 169 U.S. 466 (1898), *with Power Comm'n v. Hope Gas Co.*, 320 U.S. 591. Although the used and useful standard is no longer constitutionally mandated after *Hope*, it remains a constitutionally permissible legislative articulation of the perceived interests of consumers in paying directly only for the costs of a project actually in use and providing service to the public. *See* Drobak, 65 B.U.L. REV. at 96 (advocating judicial deference to legislative judgment as to meaning of public interest).

■ We answer questions 1 and 2 in the negative.

III. *Retrospective Laws*

■ PSNH argues in the alternative that, if RSA 378:30-a is constitutional under the circumstances of this rate proceeding, then the statute, nonetheless, cannot operate retrospectively to bar recovery of or on the investment made prior to its enactment date, May 7, 1979. The company's claim is based on the New Hampshire Constitution, part I, article 23, which prohibits retrospective laws:

> "[Retrospective Laws Prohibited.] Retrospective laws are highly injurious, oppresive, and unjust. No such laws, therefore should be made either for the decision of civil causes, or the punishment of crimes."

The underlying purpose of this article is "to prevent the legislature from interfering with the expectations of persons as to the legal significance of their actions taken prior to the enactment of a law." *State v. Vashaw*, 113 N.H. 636, 638, 312 A.2d 692, 693 (1973).

A retrospective law has been defined in this manner:

> "Upon principle, every statute which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective."

16A Am. Jur. 2d *Constitutional Law* § 661 (1979). Vested rights have been described as follows:

> "[R]ights which have so completely and definitely accrued to or settled in a person that they are not subject to be defeated or canceled by the act of any other private person, and which it is right and equitable that the government should recognize and protect, as being lawful in themselves, and settled according to the then current rules of law, and of which the individual could not be deprived arbitrarily without injustice, or of which he could not justly be deprived otherwise than by the established methods of procedure and for the public welfare."

BLACK'S LAW DICTIONARY 1402 (5th ed. 1979).

▇▇ Any vested right which the company has when it commenced construction was a right to the constitutional guarantees of *Hope*; namely, "just and reasonable rates" based in part upon property used and useful in the generation of electricity. This right exists today. It has not been taken away by the anti-CWIP law. Neither the company nor its investors had a vested right to the economic status quo at the time of the investment decision. Such matters as increasing costs, inflation, high interest rates, conservation, the OPEC cartel, and the myriad of other factors affecting business judgment are the concerns of the free market and its forces which ultimately fall upon management to assess. Not all management decisions are reviewable or subject to cure in the judiciary.

While the company accurately presents the legal rules with respect to retrospective laws, it fails to explain how these rules apply to its present condition. A review of the records pertaining

to the enactment and the application of RSA 378:30-a reveals that it was applied only prospectively as of May 7, 1979.

In *Re Public Serv. Co. of N.H.*, 64 N.H.P.U.C. 295, the PUC reevaluated PSNH's rates after the enactment of RSA 378:30-a. There the commission stated "since the commission is not applying RSA 378:30-a as to any rate charge rendered to consumers prior to May 7, 1979, the commission is not altering any [legal provisions for the treatment or consequences of] events prior to May 7, 1979. The commission is thus applying RSA 378:30-a to events or rates after May 7, 1979, and thereby prospectively." *Id.* at 302. In other words, PSNH was allowed to keep revenue earned from a rate base which included the value of CWIP. The commission originally included $111,258,428 as the value of CWIP in the rate base on May 25, 1978. *See Re Public Serv. Co. of N.H.*, 63 N.H.P.U.C. 127, 149 (1978). That value represented the accumulated costs at April 30, 1977, of four major projects: Seabrook I and II, Wyman IV, Millstone III and Pilgrim II. 63 N.H.P.U.C. at 138. The legislature prohibited the inclusion of CWIP by passing RSA 378:30-a a year later, in May 1979. Although the commission ordered PSNH to refund to the customers CWIP charges in *Re Public Serv. Co. of N.H.*, 65 N.H.P.U.C. 162 (1980), it limited the order to CWIP charges included in the rate from May 7, 1979, to December 28, 1979 (May 7 is the effective date of RSA 378:30-a and December 28 is the date of the emergency rate order which reflected exclusion of CWIP from the rate base). The commission noted that "[a]ny rates collected prior to the enactment of RSA 378:30(-a) (sic) are not at issue." *Id.* at 165. Thus, the rates collected after the order issued on May 25, 1978, in *Re Public Serv. Co. of N.H.*, 63 N.H.P.U.C. 127, and before the enactment date of RSA 378:30-a were left untouched.

Besides preventing the application of RSA 378:30-a to rates prior to May 7, 1979, the company asserts no other grounds for raising the issue of retrospective laws. As the post-enactment commission orders reveal, the company's argument against such application must fail.

## IV. *Emergency Ratemaking*

In the third question we are asked to determine whether the mandate to exclude CWIP from a public utility's rate base under RSA 378:30-a restricts the commission's discretion to alter rates under emergency circumstances, as authorized by RSA 378:9, the emergency rate statute. Simply stated, is the commission statutorily

authorized to ignore the restriction imposed by RSA 378:30-a when it has determined that an emergency exists for a public utility?

■■ ■■ To answer this question we apply basic rules of statutory interpretation. When interpreting two statutes which deal with a similar subject matter, we will construe them so that they do not contradict each other, *State v. Woodman*, 114 N.H. 497, 500, 323 A.2d 921, 923–24 (1974), and so that they will lead to reasonable results and effectuate the legislative purpose of the statute. *McGrath v. City of Manchester*, 119 N.H. 109, 112, 398 A.2d 842, 844 (1979); *see also Swiezynski v. Civiello*, 126 N.H. 142, 148, 489 A.2d 634, 639 (1985) ("Where reasonably possible, statutes should be construed as consistent with each other."). Legislative history serves as a valuable aid in ascertaining the meaning of statutes, *Doe v. State*, 114 N.H. 714, 717, 328 A.2d 784, 786 (1974), and we resort to such aid where the statutes are ambiguous, *Appeal of Public Serv. Co.*, 125 N.H. at 52, 480 A.2d at 24.

As the commission noted in its order, PSNH could not receive an increase under the emergency statute without ignoring traditional ratemaking methodologies. *See* Report and Sixth Supplemental Order No. 18,873, at 14 n.2. Indeed, the parties agree that in the present case the PUC is not empowered to grant emergency relief simply to increase cash-flow without regard to the source of the cash shortage. In light of the source of the emergency, cash-flow ratemaking would simply be an effort to accomplish indirectly what the terms of the anti-CWIP law prohibit.

Nonetheless, the company argues that the emergency rate statute should be construed to override RSA 378:30-a when the source of the financial crisis is caused by the anti-CWIP law. To read the statutes differently, counsel for PSNH explains, would be to produce an inconsistent result; namely, preventing the commission from performing its constitutional duties to address the claims of unjust and unreasonable rates caused by the anti-CWIP law. Counsel suggests, therefore, that the balancing discretion is broader under the emergency rate statute.

To the extent that this argument assumes the unconstitutionality of applying RSA 378:30-a in the present circumstances, we have answered it in part II above. To the extent that it raises a new issue of statutory interpretation, we begin our inquiry with the examination of statutory language. *In re Robyn W.*, 124 N.H. 377, 379, 469 A.2d 1351, 1352 (1983). RSA 378:9 provides:

"Emergency. Whenever the commission shall be of the opinion that an emergency exists, it may authorize any public utility temporarily to alter, amend or suspend any existing rate, fare, charge, price, classification or rule or regulation relating thereto."

The statute grants the commission broad discretionary powers. The commission may determine whether a state of emergency exists for a public utility or the public, increase or decrease rates, and disregard existing rules and regulations without requiring the customary complement of formal hearings and investigations. The statute does not define "emergency," but this court, in an earlier case, determined that emergency is synonymous with crisis and that "the Legislature . . . intended . . . to vest in the commission as a fact finding body wide discretionary powers to decide whether a crisis is of sufficient severity to warrant relief and if so the extent of relief." *Petition of Public Service Co.*, 97 N.H. 549, 550, 84 A.2d 177, 178 (1951).

The anti-CWIP statute, on the other hand, restricts the commission's discretionary powers in the ratemaking process. We examined the language of the statute in *Appeal of Public Serv. Co.*, 125 N.H. 46, 480 A.2d 20, and noted that each of the three sentences restricts the commission's discretion in some way. In brief, the first sentence prohibits the PUC from including CWIP costs in rates in "any manner;" the second sentence states explicitly that "at no time" may the commission base the rates on such costs while the construction work is incomplete; and the third sentence explains in particular what types of cost associated with CWIP may not be considered for ratemaking purposes until the project is actually providing service to customers. Read together, these provisions prohibit any rate to be based on investment in construction or plant that has never been placed in operation.

The one statute grants the commission general ratemaking powers under emergencies, and the other, enacted after the first, restricts the commission's discretion when determining rates. "When a conflict exists between two statutes, the later statute will control, especially when the later statute deals with a subject in a specific way and the earlier enactment treats that subject in a general fashion." *Board of Selectmen v. Planning Bd.*, 118 N.H. 150, 152, 383 A.2d 1122, 1124 (1978). RSA 378:30-a was enacted after the emergency statute. The anti-CWIP statute is unconditional in its prohibition, and makes no exceptions for emergencies.

Our review of the legislative history leads to a similar conclusion—the anti-CWIP law applies to emergency circumstances. Although the legislative journals are silent with respect to the objective and scope of Laws 1913, 145:12, the predecessor of RSA 378:9, they are not silent with respect to RSA 378:30-a. Members of the Senate proposed amendments to the anti-CWIP bill (HB 155) during the April, 1979 session. *See, e.g.*, N.H.S. JOUR. 604–05 (1979). One amendment would have conditioned the deletion of CWIP charges so that it would occur when the New Hampshire public utilities' ownership in Seabrook fell under 50%. Another amendment would have provided protection to New Hampshire public utilities' ownership by granting the PUC discretion to include CWIP when necessary to protect the 50% ownership. Despite the concerns expressed by the proposing members of the Senate with respect to the financial integrity of New Hampshire's public utilities, particularly PSNH, the amendments failed. No mention was made of using the emergency statute as an alternative. The discussions had by the members of the Senate indicate that there was no intention to provide an exception to the anti-CWIP law.

 The company makes an erroneous assumption that the anti-CWIP statute has caused the existing rates to become unjust and unreasonable rates. We have concluded in response to questions 1 and 2 that the application of that statute to PSNH's present ratemaking proceeding is constitutional, which is to say that the anti-CWIP statute is also constitutional under emergency circumstances. Therefore, our interpretation of RSA 378:30-a and RSA 378:9 does not produce an illogical result, but rather, a consistent result which effectuates the legislative purpose of the statute.

*V. Conclusion*

 In conclusion, we determine that the application of the anti-CWIP law to the facts presented to us by the company in this interlocutory transfer would not violate the provisions of either the New Hampshire or the United States Constitution. The same rights to rates that the company had before anti-CWIP are the same rights that it has today. The anti-CWIP statute is a reaffirmation of the "used and useful" concept standing for the proposition that the direct consequences of investment risk for new plants must be borne by investors, not ratepayers. In the broad sweep of utility regulation and financing, fundamental changes in risk allocation

are policy matters for the legislature rather than constitutional matters for the courts.

*Remanded.*

All concurred.