**In re PUBLIC SERVICE COMPANY
OF NEW HAMPSHIRE, Debtor.**

**Bankruptcy No. 88–00043.**

United States Bankruptcy Court,
D. New Hampshire.

April 20, 1990.

See also, Bkrtcy., 114 B.R. 804.

Richard Levin, for Public Service Co.

Geoffrey B. Kalmus, J. Michael Deasy, for Unsecured Creditors Committee.

Richard N. Tilton, Howard J. Berman, for Equity Committee.

Harold T. Judd, Asst. Atty. Gen., Concord, N.H., Mark W. Vaughn, Manchester, N.H., for the State of N.H.

Virginia A. Greiman, Wellesley Hills, Mass., U.S. Trustee.

George J. Wade, Barbara Gould Overend, for Citicorp and Consol. Utilities & Communications, Inc. (CUC).

Paul R. Gioia, Examiner, George A. Hahn, Michael S. Schreiber, for the Examiner.

John B. Nolan, Jeffrey G. Grody, Janice B. Grubin, Katherine A. Burroughs, for Northeast Utilities Service Co.

Victor Bass, Boston, Mass., for Maryland Nat. Bank as Indenture Trustee Co.

Paul A. Savage, Concord, N.H., for Pinetree Power, Inc., Pinetree Tamworth, Bio Energy.

Ted A. Berkowitz, New York City, for First Fidelity, Nat. Ass'n, New Jersey, Indenture Trustee.

Peter Nils Baylor, Boston, Mass., for Bank of New England, Indenture Trustee.

Robert Drain, New York City, for Shearson, Lehman, Hutton, Inc.

Paul R. DeFilippo, Newark, N.J., for Midlantic Nat. Bank.

Lawrence R. Katz, Boston, Mass., for Small Power Producers.

Bradford Paul Anderson, Newton, Mass., for New England Power Service.

Robert C. Richards, for Martin Rochman, Edward Kaufman, and Robert Richards.

Allen M. Rideout, pro se, and for Allene L. Rideout.

Harry Saxon, pro se.

## MEMORANDUM OPINION ON "PREPAYMENT PREMIUM" ISSUE

JAMES E. YACOS, Bankruptcy Judge.

This decision involves the Objections to Confirmation of Maryland National Bank and Bank of New England, as Indentured Trustees, to the Third Amended Joint Plan of Reorganization proposed by Northeast Utilities Service Company and others. Both parties are seeking what is typically termed "prepayment premiums" under the terms of Indentures of which they are acting as trustee. The additional amount that they claim, in addition to the distribution now provided to their bondholders under the Plan, totals approximately $9.3 million. This Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(L), and the general reference order dated February 11, 1985 by the U.S. District Court for New Hampshire. A hearing was held on April 4–5, 1990, and I then took the matter under submission.

## FACTS

Maryland National Bank is successor trustee under an indenture dated as of January 1, 1943, securing the First Mortgage Bonds issued by Public Service Company of New Hampshire, which are secured by first priority liens on substantially all property of Public Service. The First Mortgage Bonds are classified as Class 1 claims under the plan. Under the terms of the plan, the principal of (amounting to $131,585,000) and any unpaid interest on the First Mortgage Bonds would be prepaid in full on the effective date of the plan. The plan does not provide for payment of premiums upon early redemption of the bonds [1], although the indenture provides for payment of an additional amount fractionally above the face amount besides principal and interest in the event of early redemption "at the option of the Company." [2] The amount of this premium as of the scheduled effective date of July 1, 1990 would be approximately $3.4 million.

Bank of New England is the indenture trustee under an indenture dated as of August 15, 1978 (and supplemental securing indentures) of certain General and Refunding Mortgage Bonds, which are secured by second priority liens on substantially all property of Public Service. The G & R Bonds are classified as Class 2 claims under the plan. Under the terms of the plan, the principal of (amounting to $195,-

1. The plan in Article II, Section A expressly states that " 'Allowed Claim' does not include any claim for prepayment premiums."

2. The relevant provisions of the indenture covering the bonds are as follows:

Section 2. All or any part of the Series A bonds at any time outstanding, or any part of the principal amount constituting one thousand dollars ($1,000) or any multiple thereof of a fully registered Series A bond, may be called, at the option of the Company or for purposes of the sinking fund or other provisions of this Mortgage, for redemption at any time prior to maturity, whether or not an interest date, in each case at the percentages of the principal amount thereof specified in the forms of the Series A bonds hereinabove recited, together in each case with accrued and unpaid interest to the date fixed for redemption in the call.

Original Indenture at 60.

On the conditions, in the manner and with the effect provided in the Mortgage, this bond, either singly or together with other bonds of Series M, may be called, at the option of the Company or for the purposes of the sinking fund for bonds of Series M or any other provisions of the Mortgage, for redemption at any time prior to maturity upon not less than thirty (30) days' prior notice given by publication, (i) if from sinking fund moneys deposited with the Trustee, at the respective percentages specified in Column A below, and (ii) if pursuant to any other provision of the Mortgage or at the option of the Company, at the respective percentages specified in Column B below, of the principal amount hereof, upon calls ...

Thirteenth Supplemental Indenture at 4.

700,000) and any unpaid interest on the G & R Bonds would be prepaid in full on the effective date of the plan. The plan does not provide for payment of premiums upon early redemption of the bonds, although the indenture provides for payment of an additional amount fractionally above the face amount besides principal and interest in the event of early redemption "at the option of the Company." [3] The amount of the "prepayment premium" as of the scheduled effective date of July 1, 1990 would be approximately $5.9 million.

The Debtor commenced this chapter 11 proceeding on January 28, 1988, some two days after the New Hampshire Supreme Court turned down a constitutional challenge by the Debtor to a statute preventing it from recovering costs of the completed but as yet unlicensed Seabrook nuclear power plant. See *Petition of Public Ser-* *vice Company of New Hampshire,* 130 N.H. 265, 539 A.2d 263 (1988). As the Court there noted the case had a factual background "which must be unique in the annals of public utility financing." 130 N.H. at 267, 539 A.2d 263. It was clear in both the record before the NHPUC below and before the New Hampshire Supreme Court that the Debtor would have to file a bankruptcy organization proceeding if it did not obtain authorization for additional financing and rate increases from the NHPUC, notwithstanding the New Hampshire "anti–CWIP" statute (RSA 378:30–a) forbidding recovery of construction costs for a plant not yet on line and producing electricity. Since the Debtor was a regulated utility whose sole source of income was subject to regulatory decisions—a situation also unique in the annals of chapter 11 reorganization proceedings—it can be said that the Debtor in this unique circum-

---

3. The relevant provisions of the indenture covering the bonds are as follows:

[2.12] (B) Redemption. (1) For cash. The Series A Bonds shall be redeemable in whole or in part (in multiples of $1,000) prior to maturity by the operation of the sinking fund provided therefor in (C) below, or at the option of the Company, or by operation of various provisions of this Indenture, at any time and from time to time, at the applicable redemption price plus interest accrued to the date fixed for redemption on the principal amount of the Bonds being redeemed. The applicable redemption price shall be:

\* \* \* \* \* \*

(b) the price then applicable set out under the heading "General Redemption Prices" in the form of Series A Bonds hereinbefore set forth if the bonds are redeemed at the option of the Company or through the application of moneys deposited with the Trustee as the basis for the issuance of bonds of any series or through the application of replacement fund moneys pursuant to Article 8. Notwithstanding the foregoing, neither the Series A Bonds nor any portion thereof shall be redeemed prior to August 15, 1988 other than by application of sinking fund moneys if such redemption is for the purpose or in anticipation of refunding said Bonds, or any part thereof, through the use, directly or indirectly, of funds obtained by the Company from the incurring of indebtedness for borrowed money or the issuance of preferred stock having in either case (i) an effective interest or dividend cost to the Company (computed in accordance with generally accepted financial practice) of less than 10⅛% per annum or (ii) as of the date of the proposed redemption a Weighted Average Life to Maturity less than the Weighted Average Life to Maturity of the Series A Bonds.
Original Indenture at 58.
For Series B and C (differing one from the other, as indicated, only as to series reference, and certain dates and percentages):

1.02. Redemption. (1) For Cash. The Series [B][C] Bonds shall be redeemable in whole or in part (in multiples of $1,000) prior to maturity by the operation of the sinking fund provided therefor in section 1.03 hereof, or at the option of the Company, or by operation of various provisions of the Indenture, at any time from time to time, at the applicable redemption price plus interest accrued to the date fixed for redemption on the principal amount of the Bonds being redeemed. The applicable redemption price shall be:

\* \* \* \* \* \*

(b) [for redemptions other than through the sinking fund,] the price then applicable set out under the heading "General Redemption Price" in the form of Series [B][C] Bonds hereinbefore set forth. Notwithstanding the foregoing, neither the Series [B][C] Bonds nor any portion thereof shall be redeemed at the General Redemption Price prior to [September 15, 1984] [January 15, 1985] if such redemption is for the purpose or in anticipation of refunding said Bonds, or any part thereof, through the use, directly or indirectly, or funds borrowed by the Company and an effective interest cost to the Company (computed in accordance with generally accepted financial practice) of less than [12.30%] [14.85%] per annum.
First Supplemental Indenture at 15; Second Supplemental Indenture at 15.

stance was in fact forced to come into the federal bankruptcy court.

Following the commencement of the chapter 11 proceeding, the Debtor for a period of a little over one year was able to negotiate exclusively with regard to a plan of reorganization under the provisions of § 1121 of the Bankruptcy Code and under the terms of one extension order granted by the Court in mid–1988. However, on March 16, 1989, this Court denied the Debtor's Motion for a Second Extension of the Exclusivity Period and allowed any party in interest to file a plan of reorganization in the chapter 11 proceeding. There then ensued a competitive bidding process, by virtue of various procedural orders entered by the Court, under which the Debtor and three outside public utility companies submitted competitive "bids" in the form of competing reorganization plans. Except for the plan put forward by the Debtor, the other bids contemplated an acquisition or merging of the Debtor into the acquiring entities.

During a series of hearings on disclosure statements in the September to December 1989 period the various competing plans of reorganization were constantly being improved to secure the favor of the official committees representing shareholders and equity holders in the case, as well as the favor of the Governor of New Hampshire and New Hampshire legislative leaders, together with representatives of the NHPUC, pertaining to the rate increases that would be required under any reorganization plan.

As a result of this "auction" process the acquisition plan put forward by Northeast Utilities Company, of Hartford, Connecticut, which embodied a Rate Agreement agreeable to the representatives of the State of New Hampshire, was joined in and supported by the two official committees in this case. At that juncture, the Debtor and the other competing plan proponents indicated that they would not go forward with their own plans of reorganization.

Thereafter, the Debtor and other parties in interest in this case had joined as "coproponents" of the plan put forward by Northeast Utilities. On December 28, 1989, the Third Amended Joint Plan of Reorganization which is presently before this Court for confirmation was filed by Northeast Utilities Service Company, the Debtor, the two official committees, and certain other entities. Under this plan it is contemplated that the Debtor will ultimately be merged into Northeast Utilities and its subsidiaries.

During the negotiations that led up to the filing of the various plans of reorganization, the indenture trustee banks covering the bonds here in question indicated on numerous occasions their opposition to any plan that did not take out these secured bonds in cash. On April 14, 1989 representatives of BNE and MNB, as part of a "Unofficial Committee of Senior Secured Creditors", dispatched a letter to the Examiner appointed in this case indicating that they would pursue a position requiring cash payment of their bonds in any plan that might be presented for confirmation:

> No plan, to be acceptable to the Committee, should provide for any payment to be made to junior creditors prior in time to payment in full of the Senior Secured Creditors.[4]

On May 26, 1989, Attorney Victor Bass representing MNB, sent another letter to the Examiner indicating his disquiet at not being invited to a meeting to be convened by the Examiner and stating further:

> If you do not believe we should be at your meeting Wednesday, we obviously will not be there. I request, however, that you notify me promptly after the meeting if any party is seriously proposing keeping our debt in place while junior interests are paid. If so, it would appear that we have a new, serious, and, I think, unnecessary problem in this case, that may thwart a consensual plan.

---

**4.** The letter goes on to indicate it was "reserving the committee members' rights to seek" various additional features including prepayment premiums under the bonds but this assertion does not take away in any sense from the important fact that a takeout in cash was the firm position taken by the committee including BNE and MNB. This point will be developed later.

On June 14, 1989, Victor Bass on behalf of MNB directed a letter to Richard Levin, the attorney for the Debtor-in-possession, emphasizing a firm "cash payment" position:

I do not believe the company can get away with "reinstating" the First Mortgage Bonds under a stand alone plan in the present context. I am not prepared to brief the issues involved in this letter but you can rest assured that we will be prepared to do so at the appropriate time, should that ever become necessary.

I do not recall expressing "a strong preference for reinstatement" in January, and do not believe I did. I do not believe I have wavered from the position stated in my letter to you of December 13, 1988 that the Bank acts on the assumption that "holders of the First Mortgage Bonds would like to be paid in cash in full and the likelihood of such an outcome in a Chapter 7 liquidation provides a ready standard against which to measure any plan proposal." Since that time two other plan proponents have offered full payment in cash to the First Mortgage Bondholders, thus compounding the company's problems if it is inclined to offer any less.

So far, the only "party" who has raised the spectre of an attempt to deny First Mortgage Bondholders cash payment, other than the company in its self-described "defunct" December 27 plan, is Mr. Gioia. Hence, my letter of May 26 was directed to him. Do I understand yours of the 31st to mean the company will propose a new plan with "reinstatement" as a feature? I would appreciate your informing me if you are aware of any other party which is proposing such a scheme; I am not aware of any.

As the disclosure statement hearings proceeded with regard to the four competing plans of reorganization in the Fall of 1989, the "Unofficial Committee of Senior Secured Creditors" including BNE and MNB filed various responsive pleadings to the disclosure statements being filed by the various plan proponents. With regard to the disclosure statement as to the Debtor's then pending plan of reorganization, the committee on November 6, 1989 (Document No. 2804) stated the following:

Indeed, given the fact that two plan proponents (UI in a Seabrook Scenario) in this case have unequivocally committed, if their plans are confirmed, to pay the senior secured creditors in Classes 1 through 4 in full in cash, the Senior Committee expects that the senior secured creditors will strongly oppose a plan that eschews cash payment in full in favor of a new debt security.

\*      \*      \*      \*      \*      \*

Indeed, neither NU nor NEES, in their respective disclosure-statement liquidation analyses, even contemplates anything less than cash payment in full of the Debtor's secured creditors.

The Joint Plan of Reorganization was brought before the Court for hearings that commenced on April 4, 1990 resulting in some six trial days of testimony and exhibits submitted in support of confirmation. Notwithstanding the fact that the plan treats Classes 1 and 2 as unimpaired, the plan proponents nevertheless solicited a vote in those classes to cover the situation if the claims in those classes should be deemed impaired. Of the bondholders who voted, 99 percent in each class voted in favor of the plan.

## LEGAL DISCUSSION

Both objecting parties assume that they are impaired classes because the prepayment premium is not provided for in the plan. Assuming they are impaired, they then allege that the plan fails to meet Section 1129(a)(7)(A)(ii)—the "best interest of creditors test." This section provides in part:

§ 1129 Confirmation of plan

(a) The court shall confirm a plan only if all of the following requirements are met:

(7) with respect to each impaired class of claims ...

(A) each holder of a claim ... of such class

(ii) will receive or retain under the plan on account of such claim ... property

of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date ...

Thus, they contend they would get more in liquidation due to their highly secured position so the plan cannot be confirmed.

■ The first problem, with this position asserted by BNE and MNB, is that the bondholders in question are only impaired if their allowable claims are not being paid in full. The issue presented is precisely *whether* they are entitled in law on the facts of this case to prepayment premiums. That additional claim in my judgment is not allowable since it was in effect waived by the conduct of the representatives of the bondholders in these proceedings. It is uniformly recognized that prepayment premiums are generally not enforceable when "waived" by acceleration demands or other conduct indicating immediate cash payment is desired. See *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 1000 (Bankr. 9th Cir.1989), and cases cited therein. There clearly was such conduct here by representatives of BNE and MNB in the unfolding negotiations relating to this reorganization proceedings.

The Court of Appeals in *Matter of LHD Realty Corp.*, 726 F.2d 327, 333 (7th Cir. 1984), held that a secured creditor there lost its right to prepayment premiums by its conduct in filing a request for relief from the automatic stay in a chapter 11 proceeding and noted that: "National [the secured creditor] fired the first shot and is bound thereby." In the present case, the indenture trustee banks fired "many shots" to the effect that immediate cash payout was desired and they and their bondholders should likewise be bound thereby.

It is also instructive to note that the BNE and MNB do not argue that sustaining their objection would require a complete new process involving a plan which does not prepay their bondholders, or alternatively provides for payment of the prepayment premiums, and then a new disclosure statement process and new voting and plan confirmation procedures. They suggest in various fashions that those thorny procedural requirements of the Bankruptcy Code could be finessed. I disagree. The voters that voted approval of this plan were told that these bondholders would not get prepayment premiums. If I were to sustain these objections to this plan I would necessarily in my judgment have to require a new plan and voting procedure to be put in place.

■ The second problem, with the position asserted by BNE and MNB, is that the claim for prepayment premium is also not allowable because it was not triggered by a "voluntary" call for a redemption of the bonds in the "option of the Company" sense intended by the indentures involved. The question of whether a particular bankruptcy proceeding does or does not result in a "voluntary" or "involuntary" redemption, or whether prepayment premiums generally are enforceable, is not a sterile theoretical analytical activity under the case law. The courts actually engage in a fact-specific inquiry into the particular circumstances surrounding the secured creditor and the debtor in the bankruptcy proceeding involved. See *In re Planvest Equity Income Partners IV*, 94 B.R. 644, 645 (Bankr.D.Ariz.1988) ("it is recognized that a debtor's disposition of property under a Chapter 11 may be *involuntary.*"); *Imperial Coronado Partners, Ltd., supra,* at 1000 ("ICP assessed its situation and decided that selling the property under § 363 was a better business decision then attempting to refinance the property and deaccelerate the loan as part of a reorganization plan.... the decision ... was voluntary.") *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr.C.D.Cal.1987) ("No bankruptcy policy compels the invalidation of a properly drawn prepayment premium clause *in all cases*") (emphasis added); *Matter of LHD Realty Corp., supra,* at 329 ("because we believe that *in the particular circumstances* of this case the holder's right to a prepayment premium was not triggered, we affirm").

Here, the prepayment premium provisions of indentures in question are triggered only when the prepayment is at the "option" of the borrower. Under the factual circumstances recited earlier, regarding the filing of this chapter 11 proceeding, and considering the various negotiations and ultimate formulation of a plan or reorganization in this case, in my judgment the provision of the plan presented for confirmation denying prepayment premiums was in no sense an exercise of a voluntary "option" by the borrower. It certainly cannot be said that the chapter 11 filing here was a scheme to avoid prepayment premiums on outstanding indebtedness. Cf. *Matter of LHD Realty, supra* at 331.

In addition, the payout of the bonds in cash under the pending plan of reorganization is not voluntary, in the particular circumstances of this case, because this results primarily from a takeover plan by another utility, as indicated above. Once this Court terminated the exclusivity period the Debtor no longer had control over the formulation of a plan of reorganization and any provisions with regard to the payment of these bonds. The fact that the Debtor subsequently joined in the Northeast Utilities plan after that plan was supported by the official committees and the State of New Hampshire is immaterial in this regard. In any relevant sense necessary for present purposes, the pending plan of reorganization would have gone forward for confirmation whether or not Debtor joined in as a co-proponent.

■ The third problem, with the position asserted by BNE and MNB, regarding the alternative of liquidation and meeting the § 1129(a)(7) test, is that in liquidation the bondholders would not receive the prepayment premium because the redemption would not be voluntary. The chapter 7 trustee does not have a choice of whether to pay off the note presently or continue to hold the cash for the life of an instrument and pay interest. A case endorsing this proposition is *In re Planvest Equity Income Partners IV*, 94 B.R. 644 (Bankr.D. Ariz.1988). Judge Mooreman there stated:

[The] argument that it would be entitled to the prepayment penalty in a liquidation is not persuasive because payment of the debt resulting from liquidation would not constitute a "voluntary" prepayment.

*Id.* at 644–5.

This Court is aware that two judges on a Bankruptcy Appellate Panel for the Ninth Circuit did not adopt the *Planvest* reasoning in *Imperial Coronado Partners, Ltd., supra*. However, I find the reasoning of the dissenting opinion, also by Judge Mooreman, more persuasive. He stated in part:

To enforce a penalty provision for prepayment when no other feasible alternative exists, looks to form over substance and overlooks the equitable nature of the bankruptcy forum.

*Id.* at 1001.

Judge Mooreman relied in part in his dissent on Judge Volinn's dissenting opinion in the BAP's decision of *In re Technical Knockout*, 68 B.R. 463, 469 (Bankr. 9th Cir.1986) rev'd 833 F.2d 797 (9th Cir.1987), where he stated:

Debtors who file under *any* chapter of the Bankruptcy Code have few, if any, options. As a practical matter, they file bankruptcy because it is a last chance for a relatively ordered financial liquidation or rehabilitation rather than the out-of-court financial debacle facing them on the eve of bankruptcy.

In the absence of any controlling precedent in the First Circuit, I elect to follow the reasoning and approach of Judges Mooreman and Volinn—even in dissent.

CONCLUSION

One would have to be deaf, dumb, and blind not to have noted during the course of this reorganization proceeding that the representatives of the senior secured indebtedness, all of whose bondholders were current pre-bankruptcy, and have been kept current with continuing interest payments post-bankruptcy by the orders of this Court, were in no wise waiting hopefully for a plan that would leave their debt in place with no prepayment. They consist-

ently negotiated and demanded that the bonds be taken out in cash. It is true that they also said on occasion that they were "reserving" their rights to require prepayment premium payments. What does such a "reservation" mean in that context? In my judgment they were trying to straddle, i.e., *pressing* for cash prepayment in the *plan* but also indicating they still could claim *contractual* rights to prepayment premiums as though the foregoing pressure had not been applied. This is simply too clever by half. From the entire record in this case it can safely be said that these objectors would have opposed any plan that did *not* prepay their debts.

The objections to confirmation of the pending plan of reorganization by Maryland National Bank and Bank of New England should be overruled, and the Confirming Order on the pending plan of reorganization entered separately this date will so provide. This disposition of this matter renders it unnecessary to decide the other grounds for overruling the objections briefed by the parties on this matter.