### In re NEW HAMPSHIRE ELECTRIC COOPERATIVE, INC., Debtor.

**Bankruptcy No. 91–11336.**

United States Bankruptcy Court, D. New Hampshire.

March 20, 1992.

See also 131 B.R. 249.

E. Franklin Childress, Jr., Boston, Mass., U.S. Trustee.

George J. Marcus, Gerald M. Amero, Valerie S. Libby, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for Creditors' Committee.

Mark W. Vaughn, Frederick J. Coolbroth, Devine, Millimet & Branch, P.A., Manchester, N.H., Harold T. Judd, Asst. Atty. Gen., Office of Atty. Gen., Audrey A. Zibelman, General Counsel, N.H. Public Utilities Com'n, Concord, N.H., for State of N.H.

Thomas D. Rath, Rath, Young, Pignatelli and Oyer, P.A., Concord, N.H., John B. Nolan, Jeffry G. Grody, Carole J. Mack, Day, Berry & Howard, Hartford, Conn., Pierre O. Caron, Asst. Gen. Counsel, Public Service Co. of N.H., Manchester, N.H., for NU/PSNH.

Thomas Eddy, Special Projects Staff, The Rural Electrification Admin., U.S. Dept. of Agriculture, Washington, D.C., for Rural Electrification Admin. (REA).

James G. Bruen, Jr., Lacy R. Harwell, Jr., Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for REA.

Richard M. Lawrence, U.S. Dept. of Agr., Office of Gen. Counsel, Washington, D.C.

John J. List, Cynthia Garegnani, Nat. Rural Utilities Co-op. Finance Corp., Herndon, Va., Wilbur F. Foster, Jr., Thomas W.E. Joyce, III, Milbank, Tweed, Hadley & McCloy, New York City, Joseph A. Foster, McLane, Graf, Raulerson & Middleton, P.A., Manchester, N.H., for CFC.

Sheila Oliver, Drinker, Biddle & Reath, Philadelphia, Pa., for United Engineers and Constructors, Inc.

Connie L. Rakowsky, Orr and Reno, P.A., Concord, N.H., for New England Power Co.

Mary Ann Lynch, Gen. Counsel, Maine Yankee Atomic Power Co., Augusta, Me., for Maine Yankee Atomic Power Co.

Page Brown, Brown and LaPointe, P.A., Exeter, N.H., for Lyman R. Hammond, Jr. and Faye A. Hammond.

Robert A. Olson, Paul A. Savage, Brown, Olson & Wilson, P.C., Concord, N.H., for Alexandria Power Associates, Bio Energy Corp., Bridgewater Power Co., L.P., Hemphill Power and Light Co., Pinetree Power, Inc., Pinetree Power—Tamworth, Inc., Timco, Inc. and Whitefield Power and Light Co.

Cohn, Roitman & Kelakos, Daniel C. Cohn, A. Davis Whitesell, Boston, Mass., Merrill & Broderick, Mark W. Dean, Manchester, N.H., for debtor.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This Court held confirmation hearings on February 24, February 25, March 9, and March 17, 1992 on the Second Amended Plan of Reorganization jointly proposed by the debtor, the State of New Hampshire, and the Public Service Company of New Hampshire, dated January 13, 1992, as modified, with an extensive evidentiary record submitted by both the joint plan proponents in support of confirmation of the plan and by the Official Member Committee ("member committee") in opposition thereto. The Official Unsecured Creditors' Committee supports confirmation of the plan.

The Court at the conclusion of the March 17, 1992 hearing announced from the bench that it would confirm the plan of reorganization notwithstanding the opposition of the member committee and the Court today is entering separately an order confirming the plan and specific detailed findings of fact and conclusions of law supporting confirmation.

At the conclusion of the hearings the Court announced from the bench certain findings and conclusions on key aspects of the issues presented in the confirmation hearings, with the proviso that the Court reserved the right to amplify, revise or modify those general findings and conclusions in a subsequent written opinion. This formal opinion then supersedes the announcements from the bench and constitutes the Court's general findings and conclusions on key aspects of the dispute between the member committee and the plan proponents as to the confirmation of the plan of reorganization.

### Noncompliance/Good Faith Issues

While not extensively argued by the member committee at the conclusion of the hearings, the committee in its pleadings and at various times in the arguments during the course of the hearings indicated its view that the plan could not be confirmed because it was not obtained in good faith and was otherwise not in compliance with the requirements under § 1129(a)(1), (2) and (3) of Title 11 of the U.S.Code. The Court rules that, with regard to the first two subsections as to whether the plan complies with the applicable provisions of Title 11 and whether the proponents of the plan have complied with the applicable provisions of Title 11, i.e., the Bankruptcy Code, that there is no showing here that these plan proponents have not complied nor that the plan does not comply with the applicable provisions of the Code.

I make that ruling and finding based on the absence of any showing that there is any specific noncompliance relevant to those two grounds. There are of course arguments that the member committee has made with regard to other portions of § 1129 on confirmation standards, and to

the extent those are raised, they will be dealt with separately. I rule now only that there is no showing before me that there is any specific other noncompliance factors that would prevent confirmation that relate strictly to subsections (1) and (2) of § 1129.

With regard to subsection (3) providing that the "plan has been proposed in good faith and not by any means forbidden by law" the member committee has not articulated in any one place exactly what they mean by that but I gather by the prior pleadings and comments made during the various stages of this hearing that they believe that since they were not in the final negotiating sessions, with regard to the plan provisions that were brought forward for confirmation, that that fact ipso facto constitutes lack of good faith or a means forbidden by law in the formulation of a plan of reorganization.

I disagree on that as well. There is no good faith bargaining requirement in the sense of statutory "duty to bargain in good faith" akin to that imposed under the labor laws in the chapter 11 reorganization provisions. Obviously any party in interest can seek to negotiate on a consensual plan and equally the other parties can refuse to negotiate with a particular party if they feel that that party's position is not going to lead to a consensual arrangement.

The important thing is that there is sufficient disclosure to permit all parties to evaluate the proposed plan and, if so advised, decide to oppose confirmation of the plan. That is a question under § 1125 of the Code that has already been passed upon in approval of the disclosure statement. I have not in this record heard that there is any inadequate disclosure, even if that issue were properly raised now, and I take that objection to be simply the Committee's belief that since they weren't invited into the final negotiations on the plan that fact as a matter of law bars confirmation of the plan under § 1129(a)(3).

As I say I don't believe that is the law and I think particularly in this case there is good justification for the limited role that this committee was given in this proceeding. At the outset of this case I was presented with the proposition that there was a member committee in this case as

well as the debtor, the unsecured creditors committee, and the State of New Hampshire as parties in interest. I did not appoint that Committee. The U.S. Trustee did. It was not my function to decide whether there would or would not be a member committee in this case.

A member committee having been appointed by the U.S. Trustee the issue then came before this Court as to whether that committee had such status in the circumstances of this case that the court could as a matter of law, and should if permissible, force the other parties to negotiate with the member committee over their objections.

At a particular point in the early stage of this case it became apparent that that committee was filing memorandums and pleadings that were entirely unnecessary and were running up the costs of this proceeding. At that juncture I ruled, as is embodied in various orders and opinions, that their function in this case should be limited to reacting to the plan that might come out of the negotiations between the major negotiating parties, i.e., the Rural Electrification Administration ("REA"), with a debt of $264.3 million dollars; the National Rural Utilities Cooperative Finance Corporation ("CFC"), with a debt of $8.6 million dollars; Public Service Company of New Hampshire ("PSNH"), which had manifold disputes and litigation problems on all fronts with this debtor as its wholesale power supplier; and the State of New Hampshire, which had a vital interest in assuring that rates for the reorganized debtor would be reasonable. Those major negotiating parties had made it abundantly clear that they felt that including the member committee in their negotiations, in view of member committees adamant opposition to any increase in rates, would be counterproductive to negotiating any consensual agreement between themselves and would serve no useful function in the circumstances.

I felt then and I still feel that the State of New Hampshire was adequate to move for the lowest possible rates that would protect power users and still do what was necessary to satisfy the REA and the CFC and PSNH without going into extended and lengthy litigation. However, it was made to appear at the early hearings that the State might have some conflict because they had previously negotiated a deal on rates and other matters with PSNH in its prior chapter 11 reorganization, see *In re PSNH*, 114 B.R. 813 (Bankr.D.N.H.1990), and there might be some inclination, whether conscious or not, to favor the PSNH ratepayers under the confirmed plan in that case and in effect to have the ratepayers in this case solving some problems or benefitting the ratepayers in the other case to keep that rate structure in place.

It was for that reason that I felt that while it was not appropriate to force the other parties to include the member committee in their discussions, over their objections, the member committee still could serve a useful function in reacting to whatever plan that was negotiated between the major parties to serve as a sort of watchdog to advise this Court as to whether the State in negotiating rates in this case might have gone overboard in favor of PSNH as opposed to the ratepayers involved in this case. That being the reason for that status of the member committee, and the Court having articulated it as clear as it could back in September, it is my judgment that to come in at this stage and say that the plan was not negotiated in good faith or was not proposed in good faith under 1129(a)(3) is not sufficient ground to bar confirmation of the plan.

This case involves substantial liabilities, substantial complexities, and substantial prospects of ongoing litigation if this plan is not confirmed and, whether it can be confirmed or not under the other factors in § 1129, it is my judgment and ruling that confirmation should not be barred under § 1129(a)(3) for the reasons indicated.

*Feasibility/Rates & NHPUC*

■ The member committee's first feasibility contention is bottomed on the argument that the plan is based upon rates that would be so unlikely to come out of the New Hampshire Public Utility Commission Proceeding (provided for under the plan to follow confirmation) that it would be a fu-

tile act or inappropriate to confirm the plan, subject to that contingency, because there would be no substantial likelihood that the NHPUC would approve those rates.

On that issue I do not believe the member committee has made a strong enough showing to justify this Court in cutting off this contingent plan, on that issue alone, and thus not even allow the matter to get to the NHPUC. I believe that the record indicates that there is a reasonable likelihood that the NHPUC would approve those rates and that it is likely that they will go into effect for the reorganized debtor.

It should also be noted that the plan is contingent in the sense that the effective date will not occur until the NHPUC acts upon and approves the proposed rates. In the peculiar circumstances of the reorganization of a regulated utility company under chapter 11 of the Bankruptcy Code, it seems to me that the approach taken by the plan proponents with regard to rates is eminently practical and appropriate in the circumstances. It is no secret that in utility reorganization cases talking about what rates are likely to come out of a utility reorganization, and talking about what valuation the utility enterprise may have, is a highly circular process in which simplistic references to rates and valuations in other contexts are totally useless in determining those questions. See *In re PSNH*, 88 B.R. 521, 526–27 (Bankr.D.N.H.1988); *In re PSNH*, 108 B.R. 854, 856 (Bankr.D.N.H. 1989).

If the rate-value conundrum can be finessed on a consensual basis by the parties involved, with the ultimate determination of the rates to apply to the reorganized debtor to be determined by the appropriate regulatory agency following confirmation of a plan of reorganization contingent for its effective date on that regulatory action, that seems to me to be a practical and appropriate approach.

The member committee's primary argument on this point is that the NHPUC would be obligated to employ a "used and useful" analysis to rates with regard to the reorganized debtor and that under that analysis the amount of costs attributable to the Seabrook nuclear power plant implied in the proposed rates would be excessive and that therefore the proposed rates could not be approved. The committee argues that the NHPUC employed the "used and useful" analysis in passing upon the proposed rates under the PSNH reorganization plan and that for consistency they would be obligated to do the same here.

I disagree with the fundamental assumption the committee makes in this regard. The "used and useful" analysis is only one approach and factor to be taken into account under the procedures governing the NHPUC. While it can be used to temper the rigors of the "prudent investment" analysis, also used in certain circumstances, the reverse is true in other situations. Indeed, it may be said that in the PSNH case it was apparent that the "used and useful" standard could be used to temper the "prudent investment" standard under which the stockholders in that case were arguing for full recovery of all costs attributable to the Seabrook plant, notwithstanding the extraordinary rise in retail rates that that would entail for power users served by the PSNH system. In the present case it is apparent that the "prudent investment" standard likewise can be used to temper the use of the "used and useful" standard by ratepayers arguing for very little recognition in rates of the cost of the Seabrook nuclear power plant. It is simplistic to argue that one or the other of these standards is completely controlling.[1]

However the NHPUC's actions may be characterized by the final rate approvals in the PSNH case, with regard to the inclusion of costs of the Seabrook nuclear power plant in the rate base, it is not foreordained in my opinion that the NHPUC is locked into some rigid position that will prevent their approval of the proposed rates in this reorganization, after taking into account

1. See extended discussion of regulatory standards and the regulatory process under New Hampshire statutes and NHPUC procedures set forth in *In re PSNH*, 88 B.R. 521, 527–533 (Bankr.D.N.H.1988); *In re PSNH*, 114 B.R. 820, 833–835, 839–842 (Bankr.D.N.H.1990).

not only all analytical approaches available but also the differing circumstances and variables involved with *this* debtor utility.

Accordingly, I do not accept the member committee's view that the rates as proposed in this plan are so out of bounds that it would be a futile act to send to the NHPUC to determine a rate scheduled for the reorganized debtor.

### Feasibility/Load Forecasts

■ The member committee's second contention on feasibility is that, regardless of the issues regarding rate assumptions with regard to NHPUC approval, the projections for load growth and related revenue forecasts are simply not realistic and that therefore the plan could not be performed and would likely result in further reorganization or liquidation.

The testimony of the plan proponents' witnesses however is convincing to the effect that the forecasts that were used were conservative and had a high probability of being achieved and that they were likely to be achieved. The proponents' witnesses established that even if it were assumed that there would be a one percent annual growth rate, rather than the two percent forecast under the plan, the net effect would balance out or with appropriate rate increases could cover the ongoing operations and performance of the reorganized debtor to effectuate the plan of reorganization.

There obviously is no guarantee in any reorganization case that when a Court finds the plan is feasible, i.e., the performance under the plan is likely to be achieved, that that in fact will happen in the real world following confirmation. All a reorganization Court can do is react to the evidence presented to it and make findings and determinations as to what is likely to happen. If the projections are off and if nothing else comes into counterbalance the discrepancy, it may be that further rate increases will be necessary. In the real world there simply are no guarantees of what the future holds. This plan at least guarantees fixed costs to the debtor for 15 years under its wholesale power supply. That is one uncertainty that can be re-solved by an agreement. With regard to actual performance under the projections I have the testimony of Mr. Mayben for the proponents that it should be performable and they should be able to reach these projections.

I have his further testimony that the rate increases involved would not cause a death spiral or counterproductive effect on total revenues. In addition I have the testimony as well of the committee's own expert, Dr. Rosen, that elasticity is really not a factor in this case in terms of counterproductive effects on total revenues of any rate increases contemplated under the plan or even under any future adjustments that may be necessary.

Countering the testimony and exhibits presented by the plan proponents, which include rather detailed projections that take into account various variables, I have the testimony basically of Dr. Rosen and to some extent Mr. Branscombe about the unreliability of the approach used by the plan proponents in reaching their projections. A lot of Dr. Rosen's particular conclusions in that regard are bottomed on the fact that he believes that an "end-use" analysis approach should have been used rather than the "econometric" analysis that was used.

Even he recognizes that the econometric analysis is used in rate proceedings and while the trend may be to greater use of the "end-use" approach this record does not indicate that econometric analysis itself is totally unreliable to the point that the court could find that the projected performance is not likely to occur.

In sum, on the feasibility objection based on the question of whether the real world results will approximate the projected results, I will conclude that there is a sufficient showing here that the projected performance is more likely to occur than not, but recognizing that all projections are just that, and that there always is some uncertainty as to what the actual results will be.

In that regard I should add that I am taking some comfort in reaching this determination by the reality that the this plan is not going to go into effect unless the NHPUC approves the rates and that a body

of experts in those proceedings, the public representatives and everybody else involved, are going to test these same projections which will be a part of the rate case. While it may be somewhat unique for a reorganization court to in effect buttress its conclusion about feasibility with the backstop of a regulatory agency conducting subsequent hearings, I believe that unique approach is appropriate in this unique case.

### The PSNH Settlement

■ That brings us to the other key issue in this case, i.e., the question of whether the settlement of PSNH embodied in the plan is appropriate or not. That in turn raises the question of whether the settlement is fair and equitable within the applicable case law defining that concept as applied when approving compromises embodied in a plan of reorganization. See *In re PSNH*, 114 B.R. 820, 825–827 (Bankr. D.N.H.1990).

■ Some of the common factors that are used in deciding whether to use a compromise in approving a plan of reorganization deal with the parties that have negotiated the compromise, their skills and sophistication, the energy they expended in reaching the compromise, and whether the Court believes that the settlement has been negotiated between competent adversaries that have the skills and energies necessary to hammer out an appropriate compromise. On that factor I will find that this compromise clearly was negotiated by knowledgeable professionals that had not only the skills they needed but the army of backup analysts and what not that are necessary to deal with such issues.

Another factor is the complexity of the resulting litigation if the court does not approve the compromise. That factor is so clearly established in this record, I hesitate to say much about it. Anybody that has dealt with any of these utility reorganizations, or utility issues generally, would have to recognize I believe that the fight between PSNH and the Cooperative, if it has to be litigated, will reuslt for many reasons in quite acrimonious and long extended litigation. On one issue alone, the

evaluating of the damages that PSNH would suffer if the wholesale power supply contract has to be rejected under § 365 of the Bankruptcy Code, as opposed to the committee's contention that the debtor could contractually terminate the contract with no notice and with no damages, the necessary evidence and calculations would be extensive. It doesn't just involve toting up the revenues PSNH doesn't get, but involves many interrelationships and other factors that go into their rate schedules.

I think I can simply say that if ever a case involved a complex matter of litigation that was resolved in a plan of reorganization this is such a case. The other side of that coin is of course the delay factor. I will find and conclude that a minimum of two years would be required if these matters, including the separate question of the enforceability of the sellback agreement by the debtor regarding Seabrook power, have to be litigated to get them resolved and get the matters in shape in which another plan could be confirmed. I say a minimum because I believe that it is just that since running through all the necessary regulatory and court hearings would entail no less than that amount of time.

If the PSNH compromise is not approved, there are various arguable benefits and costs to the debtor which were debated at great length during the hearings, as to the likelihood of success or failure on each of those factors. The separate specific findings and rulings deal with those factors in some detail. However, in my view the two overriding factors involve the likelihood that the debtor might be successful in holding PSNH to full enforceability of the sellback agreement while at the same time immediately and successfully terminating without a five-year notice the existing wholesale power supply contract from PSNH. Details with regard to these factors are also set forth in the separate specific findings and rulings but suffice it to say that these two factors are easily the two most important factors in evaluating the fair and equitable nature of the settlement.

The member committee argues that the debtor would prevail on the power supply

contract termination, with no net costs or damages, and would be able to gain substantially lower wholesale power costs by switching to an alternative power supplier. On enforceability of the sellback agreement, the member committee argues that the debtor should be able to prevail on that separately from the contract rejection issue, and thus require PSNH to by back the Seabrook Nuclear Power at a price substantially over prevailing market costs.

My view of likelihood on those two factors is totally different. I should preface this by saying that in this case, for better or worse, I'm uniquely positioned to evaluate those factors because I had the PSNH case first and I saw some aspects of the Cooperative's contentions in that context and now I see them from the other side. I am totally convinced that no forum is going to effectively determine these things except in a related sense. I don't think the enforceability issue is going to go anywhere unless the contract rejection thing is taken into account and vice versa. With regard to the contract rejection factor I believe that the likelihood of the debtor prevailing on that contention, with no damages payable to PSNH, is zero. On the sellback contention, I likewise believe the net benefit to this estate from litigating that matter is going to be a zero.

I take these views from my ultimate view that essentially the litigation that the Cooperative would pursue in both those aspects would be a transparent effort to try to get out of what they contractually agreed to with PSNH at a time when the views and prognosis with regard to the Seabrook plant was considerably sunnier than it later became. I believe that in any such litigation there is substantial likelihood that there would be a notice required to give PSNH time to get restructure its position before the Cooperative could get free of the power supply contract. Likewise the enforceability of the sellback agreement to me is never going to be decided independent of the other issue. The latter is already embodied in a NHPUC ruling, albeit on appeal.

It appears clear to me that the compromise is clearly fair and equitable and should be confirmed by the Court. The compromise provides the Cooperative with a good and stable source of wholesale power at fixed costs for a 15 year period. The evidence indicates that the Cooperative will have all it can do to restructure itself and get out of its problems as a distribution company without going into vertical and complex arrangements suggested only by hypothetical alternatives put forward by the member committee. The settlement gives a structured and definitive power supply to this debtor that I think is essential for its reorganization and to work out of the problems that it got itself into when it made its investment into Seabrook to profit from the lower power costs that were expected. The evidence in my judgment establishes that the PSNH settlement produces the lowest risk regarding total costs no matter which variable goes off the projections, and for that reason gives necessary stability to this debtor which is essential to its reorganization.

If there were an alternative power supply source out there, with definitive terms and conditions, then the Court would be presented with a different case. This case does not present that alternative. The alternative is, as I said during the course of the hearing, a hypothetical apple against a real apple—even though it was argued that it also presented an inappropriate "apples and oranges" comparison. I take seriously the absence of any third party here to support the member committee's position and to seek to become the alternative wholesale power supplier for this debtor after blocking this plan. I don't think denying confirmation of this plan is going to encourage any such parties, any more than they would already have been encouraged by this well-publicized case, to come in here and try to pick off this major power supply contract at more favorable terms to the debtor.

I also take seriously the position of the State of New Hampshire in this proceeding with the goal of getting the lowest rates achievable which would still settle the massive secured claims and the PSNH disputes. That is a somewhat unique factor that you don't normally have in a reorgani-

zation and a compromise situation. Notwithstanding my charge to the member committee to show some slanting or tilting of the State's position in favor of the PSNH ratepayers over these ratepayers, this record does not in my judgment show any such tilting.

I believe the State has played the role of honest broker in effect forcing the parties to negotiate both for low rates and for settlement of those claims and disputes. I also take into account the fact that in real terms (adjusting for inflation) the rates to these members in 1981 were at the level of 8.79 cents per kilowatt hour and in the year 2000 A.D. in real terms adjusted for inflation will be 8.22 cents. This amounts to an actual real decrease of 6½ percent in rates under the plan.[2]

The contention that this debtor could get by with resolving its problems without higher rates to me is just not in the cards. The cost of Seabrook has come back to roost and these ratepayers are going to have to accept that fact, as indeed did the ratepayers in the PSNH case. Basically I think the heart of the committee's position is that somehow these problems can be resolved without going to higher rates and I don't think that is going to happen under any alternative that is realistic in this situation.[3]

### Conclusion

For this debtor to survive and perform it has to first make some settlement with its two secured creditors having a total in excess of $272 million dollars in debt which greatly overshadows the relatively small unsecured and other debt in this case. The massive secured debt incurred by this relatively small utility in electing to invest in the Seabrook Plant is a big problem and that problem isn't going to go away by talking about ideal scenarios of what could or couldn't be done if an attractive alternative wholesale power supplier can be found. If the secured claims are to be cut down further in litigation, under a nonconsensual plan of reorganization, that tactic will necessarily force an attempt to value the enterprise. However, as I have noted previously in this case, as well as in the PSNH case, you really can't value a regulated utility enterprise without in effect determining the rates the enterprise may charge to its customers. While that may ultimately have to happen in some stalemated utility reorganization case under chapter 11 of the federal Bankruptcy Code that is a highly controversial prospect at best.

For this debtor to survive and perform it also has to reach some accommodation with PSNH regarding its various disputes which have festered between those parties since the filing of the PSNH reorganization proceeding in 1988. If not settled the parties would have to proceed to litigate in various federal and state regulatory forums, federal and state courts, as well as this Court.

2. I recognize in that context, as the committee has pointed out, that if you start with 1990 at a level of 6.31 cents and go to 1997 you have a 8.63 cent level which is 35 percent increase. However that comparison is not a meaningful presentation of what is actually occurring because you have to take into account that the Cooperative in effect got the benefit of a freeze on rates during the PSNH reorganization and its own reorganization, and has not been forced to raise rates because it wasn't making any debt service payments together with other reasons. I think the true comparison is in terms of historical rates before any reorganization problems, as compared to the level in 2000 A.D. On that basis I don't believe these ratepayers have too much to complain about.

3. At this point the Court will drag out once again the somewhat more wizened "carcass of a dead elephant" image that I presented to the parties at the outset of the PSNH utility reorga-

nization case. The point made was that certain parties in the early negotiations in that case seemed to be blinded toward recognizing the extraordinarily excessive ultimate costs of the Seabrook nuclear power plant that in fact was the driving force behind the need to resort to reorganization under chapter 11 of the Bankruptcy Code. On occasion the Court would note for certain tunnel-visioned parties that there indeed was that "carcass of a dead elephant" lying in the back of the courtroom which needed their considered attention in their negotiations and litigating positions. I believe the member committee in the present case hasn't taken a good look at that carcass lately. It was, after all, the Cooperative's Board of Governors that elected to invest in the Seabrook plant and if the plant had turned out as intended would have resulted in substantially lower power costs. However, the opposite happened, and as with any risk investment the consequences of a misjudgment cannot be ignored.

This plan avoids that. Such litigation also is a daunting prospect and in my judgment the members of this Cooperative would fare far worse in such litigation than they do under the settlement and compromise embodied in the plan. The retail rate payers of the debtor currently have the lowest electric power rates in New England and, as indicated above, under the plan of reorganization will see an actual decline in real terms in their electric power rates from the 1981 base year at the end of this decade.

For all of the reasons set forth in this opinion, as well as in the separate specific findings and rulings, the Court concludes that the pending plan of reorganization should be confirmed notwithstanding the objections put forward by the member committee. A separate confirming order to that effect shall be entered.